IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


DENNIS MONTGOMERY, ET AL.,          )
                                    )
          Plaintiff,                )     CV No. 17-1074
                                    )
                                    )     Washington, D.C.
      vs.                           )     June 23, 2017
                                    )     3:30 p.m.
JAMES B. COMEY, ET AL.,             )
                                    )
          Defendant.                )
_____)


TRANSCRIPT OF STATUS CONFERENCE HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:          Larry E. Klayman
                             KLAYMAN LAW FIRM
                             2020 Pennsylvania Avenue, NW
                             Suite 345
                             Washington, D.C. 20006
                             (310) 595-0800
                             leklayman@gmail.com


For the Defendants:          James J. Gilligan
                             Timothy A. Johnson
                             Caroline J. Anderson
                             U.S. DEPARTMENT OF JUSTICE
                             CIVIL DIVISION,
                             FEDERAL PROGRAMS BRANCH
                             20 Massachusetts Avenue, NW
                             Room 5138
                             Washington, D.C. 20001
                             (202) 514-3358
                             james.gilligan@usdoj.gov

APPEARANCES CONTINUED:

Court Reporter:                     William P. Zaremba
                                    Registered Merit Reporter
                                    Certified Realtime Reporter
                                    Official Court Reporter
                                    U.S. District Court
                                    for the District of Columbia
                                    333 Constitution Avenue, NW
                                    Room 6511
                                    Washington, D.C. 20001
                                    (202) 354-3249
                                    WilliamPZaremba@gmail.com


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

PROCEEDINGS

1

2          DEPUTY CLERK:  All rise.  The United States

3     District Court for the District of Columbia is now in

4     session, the Honorable Richard J. Leon presiding.  God save

5     the United States and this Honorable Court.  Please be

6     seated and come to order.

7          Your Honor, we have Civil Action No. 17-1074,

8     Dennis Montgomery, et al., v. James B. Comey, et al.

9          Will counsel for the parties please approach the

10    lectern and identify yourself for the record and list the

11    party or parties that you represent.

12          MR. KLAYMAN:  Good afternoon, Your Honor.

13    Larry Klayman for myself and for Dennis Montgomery

14    plaintiffs.

15          THE COURT:  Welcome back.

16          MR. KLAYMAN:  Welcome back.  Nice to see you.

17          THE COURT:  Nice to see you.

18          MR. GILLIGAN:  Good afternoon, Your Honor.

19    James Gilligan with the Department of Justice.

20          I represent today the government agency and

21    official capacity defendants but not, just to be clear for

22    the record, the individual capacity defendants.  As yet, we

23    have not received representation requests at the Department

24    of Justice for those defendants.

25          THE COURT:  Welcome back, Mr. Gilligan.

1               MR. GILLIGAN:  Thank you.

2               And if I may, with me at counsel table are

3     Caroline Anderson and Timothy Johnson.

4               THE COURT:  Are they also with the Federal

5     Programs Branch?

6               MR. GILLIGAN:  They, indeed, are with the Federal

7     Programs Branch, Your Honor, yes.

8               THE COURT:  Thank you, sir.

9               All right, Mr. Klayman.  There's a pretty big

10    elephant in the room.  Do you know what that elephant is?

11              MR. KLAYMAN:  The last time it was whether I was

12    wearing the red shoes.

13              THE COURT:  No, this is a bigger elephant than

14    that.

15              MR. KLAYMAN:  It is a bigger elephant, Your Honor.

16              THE COURT:  How in God's name is this a related

17    case to *Klayman versus Obama*?

18              MR. KLAYMAN:  Well, actually, those other two

19    cases are ongoing, Your Honor.

20              THE COURT:  You listed it as related.

21              MR. KLAYMAN:  Yes.

22              THE COURT:  That's how you got to me.  But how is

23    it really related factually?

24              MR. KLAYMAN:  Well, it's because it's a continuing

25    course of conduct of my having been surveilled in the past.

1            And also Montgomery was a part of that other case.

2    We had filed pleadings to say he was a material witness, we

3    want to use him in that case, and, Your Honor, we've

4    requested that it move forward.

5            THE COURT:  Well, now *Klayman versus Obama* was

6    Section 215 of the PATRIOT Act.  What you're looking at here

7    is Section 702 of FISA, right?

8            MR. KLAYMAN:  Well, we're actually alleging --

9            THE COURT:  It's a different program.

10           MR. KLAYMAN:  We're alleging, generally,

11   surveillance.  Not just 702, but there's references in the

12   complaint to continuing violations as occurred in the case,

13   and we made reference to that.  My cell phones have been

14   hacked, so have Mr. Montgomery's cell phones and computers.

15   And this is part and parcel to what's been going on under

16   215 or under the U.S.A. Freedom Act.

17           And consequently, since you are infinitely

18   knowledgeable about this case, and because there's an

19   overlap, both in plaintiffs and in witnesses, and also in a

20   continuing course of illegal conduct, they know no bounds,

21   Your Honor, in terms of respecting either the law of the

22   case, in Klayman I and Klayman II, the prior cases, or

23   Congress's U.S.A. Freedom Act.  We did talk about that in

24   the pleadings.

25           But for that matter, 702.  And we have 702 in the

1    prior pleadings as well.

2            THE COURT:  Well, the surveillance in the original

3    claim versus Obama case was bulk connection of metadata from

4    all cell phones in the United States, and, of course, that

5    has ended.

6            MR. KLAYMAN:  But, Your Honor, let me -- we can

7    get to that later, but...

8            THE COURT:  Congress even passed a law prohibiting

9    it in the aftermath of that case.

10           MR. KLAYMAN:  But the case has not ended, okay?

11   And --

12           THE COURT:  Well, no.  The case maybe has not

13   ended as to the events that occurred prior to the Congress

14   amending the law, but the conduct you're alluding to here

15   postdates that, does it not?

16           You're going after -- you're concerned about

17   targeting individuals who are opponents of the government

18   that are part of this deep-state thing, right?

19           MR. KLAYMAN:  In part.

20           THE COURT:  Okay.

21           MR. KLAYMAN:  Let me just say here to clarify --

22           THE COURT:  Go ahead.

23           MR. KLAYMAN:  -- is that Klayman I, and I know for

24   sure Klayman II, has Section 702 violations alleged.  That's

25   number one.

 1          Number two, while Your Honor issued preliminary

 2   injunctions, they went up to the D.C. Circuit and they were

 3   vacated.  But the case never ended, because we have ongoing

 4   claims there for a permanent injunction at a minimum.

 5          And I want to talk to you about service at the

 6   appropriate time, because it's difficult to serve these

 7   people, and I'll explain exactly how, the individuals.  We

 8   did send to them a copy of the complaint and the temporary

 9   restraining and preliminary injunction motion by FedEx to

10   their address.  We sent it to them.  We put them on notice.

11   And, frankly, it's an insult, I don't take it personally,

12   but an insult to this Court that no one is here on their

13   behalf.  They genuinely believe they're above the law.

14   That's the bottom line.

15          The hard fact is that we did plead 702 and those

16   cases are alive.  And while the D.C. Circuit, for whatever

17   reason, they never really explained in the second order

18   while they were vacating it, it was clear that they thought

19   that the U.S.A. Freedom Act mooted it out.  But it didn't,

20   not with regard to the past conduct and the ongoing illegal

21   conduct as we alleged that they are violating the U.S.A.

22   Freedom Act.  We do allege that in the pleadings.

23          And we've seen -- and this will be the subject of

24   discovery -- that these agencies and the individuals know no

25   bounds.

1          There are recent orders by the FISC Court, which

2   were disclosed by Circa, which got out, which say that

3   Defendant Comey, and the FBI as well, have been engaged in

4   this illegal surveillance systematically over the time

5   period of this case.

6          And we did allege that that is broad, it would

7   cover both statutes, and it would cover, frankly, just

8   ordinary concepts of the Fourth Amendment.  With or without

9   statutes, they violate the Fourth Amendment, and we pled

10  that.  You don't need the statutes.  In fact, they don't

11  care about the statutes.  No law to them is worth

12  respecting.

13         So this is a very, very important case.

14  Your Honor's the most knowledgeable about it, and that was

15  the reason, notwithstanding the factual legal overlap, that

16  we assigned it as related to you.

17         THE COURT:  So go over the common facts.  You say

18  there's common facts.

19         MR. KLAYMAN:  Yes.  Common facts concerning the

20  violation of the Freedom Act in 702 of general surveillance,

21  in violation of the Fourth Amendment.  Hacking my cell phone

22  on three occasions.  Hacking Mr. Montgomery's.  Attempting

23  to hack his computer, and, in fact, succeeding on at least

24  one occasion in doing that.

25         This is not pie in the sky stuff, Your Honor,

1    is that I've been out there for the last three months, going

2    door to door on Capitol Hill, going to the House

3    Intelligence Committee, the Senate Intelligence Committee,

4    the House Judiciary Committee, the Senate Judiciary

5    Committee.

6            I even had a personal conversation with

7    Chairman Grassley while he was walking across the Mall after

8    the Comey hearing a few weeks ago, and I filled him in on

9    this.

10           And consequently, these agencies know that I'm

11   trying to bring Montgomery forward, because this is, as

12   Your Honor pointed out -- and almost overwhelming -- I think

13   it's overwhelming -- you can remove the word "almost"

14   anymore, violation of our Fourth Amendment.

15           And it's getting to the point -- and, of course,

16   we pled with regard to plaintiffs, myself and

17   Mr. Montgomery.  But it's getting to the point where even

18   the President can't make a phone call and figure out that

19   he's able to talk in confidence.

20           I mean, things are being leaked right out of the

21   White House about calls with various foreign heads of state

22   and everything else.  And it has to be the result of this

23   continuing illegal surveillance, even on the President of

24   this country.

25           But that's just part and parcel to why it's

1   happening to me, because I've been out there as an advocate.

2   I'm not representing this administration, but I want this

3   president to succeed.  I want him to be able to do the

4   business of the affairs of state in the public interest

5   without feeling that he's got the sword of Damocles over his

6   head, that these intelligence agencies, which he has fought

7   with, justly, I believe, are out to destroy him.

8          But it is extremely logical that they would be

9   surveilling me.  And when you look at even the reports that

10  were released through FISC, the Foreign Intelligence

11  Surveillance Court, the order and what Circa was able to

12  obtain, John Solomon, Sara Carter of Sinclair Broadcasting

13  and News, is that there is a recognition by even an

14  individual who worked in the Obama Administration who was in

15  charge to investigate this, that attorney-client

16  communications are being breached.

17         So my standing here is clear cut.  So is

18  Mr. Montgomery.  But these are things that we did allege in

19  Klayman I and II, and we're alleging them again.  And those

20  cases are alive, we're seeking a permanent injunction, and I

21  was going to raise with Your Honor at the end of this status

22  conference, consolidating these actions, possibly

23  consolidating them.  But right now, I'm asking for a

24  preliminary injunction and a Temporary Restraining Order to

25  preserve the evidence that Mr. Montgomery came forward to at

1   the FBI.

2          Now, how did that happen two and a half years ago?

3   I went to Judge Royce Lamberth.  I don't have any cases in

4   front of Judge Lamberth.  And I asked him if he would help.

5   He's one of the few people in Washington that I trust, and

6   he's an honorable man.

7          And he then introduced me to James Baker, the

8   general counsel of the FBI.  And I said to General Counsel

9   Baker, I said, I want to meet with FBI Director Comey.  This

10  could be one of the biggest scandals, frankly, in American

11  history, as Your Honor pointed out as well in his orders.

12  And he assured me, well, Comey doesn't want to meet, but

13  he'll be supervising this.  I'm working with him on this.

14         We then went to the U.S. Attorney for the

15  District of Columbia, the Assistant U.S. Attorney, who is

16  the top lawyer on counterterrorism and security measures,

17  Deborah Curtis in the U.S. Attorney's Office here.

18         I negotiated two immunity agreements for

19  Dennis Montgomery; one to produce 47 hard drives, which

20  contain over 600 million pages of information, some of it

21  classified, I've never seen it, I don't want to see it.

22  I gave it, under these grants of immunity, to the FBI.

23         Montgomery was then interviewed for three hours,

24  as you know, by definition, under oath, by Special Agents

25  Walter Giardina and William Barnett.  For two and a half

1   years, we've heard nothing.  I make inquiries, nothing

2   coming back, not even that we're proceeding with the

3   investigation.

4          And then it becomes clear to me what's been going

5   on with the reports of Circa and the FISC Court; that Comey

6   himself was involved in this illegal surveillance, the FBI

7   was.  So to me, I think a reasonable inference arises, more

8   than a reasonable inference, a likelihood that Comey told

9   these agents to bury this investigation.

10          And on top of that, you have the intelligence

11   agency run by Clapper, Director of National Intelligence at

12   the time, run by John Brennan, who's been at odds with

13   Trump, and, in my view, is not a completely candid person,

14   to put it diplomatically.  He's been found lying under oath

15   for Congress.  They never did anything about it.

16          The CIA even had surveilled Diane Feinstein, who

17   was head of the Financial Committee at the time in the

18   Senate.

19          That's not even in dispute that he lied about it

20   in front of Congress, like Clapper did earlier to

21   Senator Wyden.

22          And so consequently, this is directly overlapping,

23   it's not even close.  And it's a continuation of this

24   illegal conduct which knows no bounds.  And I happen to be

25   the No. 1 protagonist, and Montgomery is the biggest threat

1    to them.

2           And everything that Montgomery has said has proven

3    to be correct.  These agencies have tried to smear

4    Montgomery in the past because they knew he was coming

5    forward.  He's been trying for years to have somebody listen

6    to him.

7           And I'm hoping that Congress will do something,

8    but this Court has to do something, because Congress,

9    I believe, either knew that this was going on through some

10   of those oversight agencies, or they're fearful that

11   information can start flying out of NSA, CIA and FBI files

12   about them and ruin their political career, as they're

13   attempting to do with President Trump right now.

14          Your Honor, I have great faith in you.  I believe

15   that you are an honest man.  And you are a courageous judge.

16   There are very few in this country, and there are very few,

17   frankly, in this courthouse.

18          And I don't mean to disparage anybody, but I've

19   had experiences over the last few years with judges

20   appointed by Democrat presidents, who have slow-rolled

21   cases, and, who themselves -- I mean, even the one case that

22   involved my former group, Judicial Watch, that it was a

23   party to, never resulted in the deposition of

24   Hillary Clinton.  Who responded?  David Kendall on behalf of

25   Mrs. Clinton, and she couldn't remember anything.

1              So if it's not you, Your Honor, it will never

2    happen.  And there is a very strong case for you to have

3    this case.  And as you pointed out at the first status

4    conference in Klayman I, this is a case of the pinnacle of

5    national importance, it continues to be, not just for me and

6    Mr. Montgomery, but for all Americans, and for the President

7    of the United States, who has been subject to continuing

8    leaks, continual legal surveillance both under the U.S.A.

9    Freedom Act and 702 as we have, Mr. Montgomery and I -- and,

10   frankly, this country hangs in the balance.

11             Even the President of the United States can't pick

12   up the phone and do business, or, for that matter, have a

13   meeting with an Ambassador in the Oval Office without

14   somehow it getting out.

15             And just yesterday when the President said, Well,

16   I didn't have any types myself, he says, but maybe there are

17   tapes that were made by the intelligence agencies.  That's

18   likely.

19             So that's the reason this is related.

20             THE COURT:  Let's hear what Mr. Gilligan has to

21   say on this topic.

22             MR. GILLIGAN:  Thank you.

23             THE COURT:  Mr. Gilligan.

24             MR. GILLIGAN:  Well, as promised, Mr. Klayman has

25   brought what we can call Klayman IV before this Court.

1          He has not made good on his promise, however, to

2     come forth with the hard evidence that he described, or at

3     least alluded to, in his briefing, his most recent briefing

4     in Klayman I and II.

5          What we are seeing, as usual, Your Honor, are

6     Mr. Klayman's unilateral suspicions that the NSA is messing

7     with him.  There is no evidence that he or Mr. Montgomery is

8     an actual target of surveillance by the NSA or any other

9     intelligence agency.

10         With respect to the hard drives that are also the

11    subject of Mr. Klayman's PI motion, there is no evidence

12    that the hard drives that he provided to the FBI several

13    years ago are in danger of destruction.  And, in fact, I can

14    tell you, Your Honor, that the hard drives are now in the

15    possession of the intelligence community's Office of

16    Inspector General, a very secure location.  So there is no

17    risk here that those hard drives or any of their contents

18    are going to be destroyed anytime soon.

19         So the preliminary injunction motion is meritless,

20    Your Honor.  And coming to the stated purpose of the

21    hearing, which was scheduling, what we would propose is

22    to --

23         THE COURT:  Well, it's a little bit more than

24    that, because there's this preliminary question, frankly, of

25    whether this Court should keep this case as a related case.

1   And then if I decide against keeping it as a related case,

2   it would go back, so to speak, into the wheel, and then --

3   now, I could get it again, in theory, as an unrelated case,

4   right?  If you count the senior judges, there's basically

5   about 18 judges on the Court, and there's a 1 in 18 chance

6   that I guess I could get it as an unrelated case.

7           But if I decide it's not a related case, it goes

8   back into the pool, and it may or may not return to

9   Courtroom 18.  I just don't know.

10           MR. GILLIGAN:  True that, Your Honor.

11           I confess that whether or not this case is

12   properly designated as a related case is not an issue to

13   which I gave any forethought before arriving today.

14           THE COURT:  How does it strike you just generally?

15   You've been in the business 30 years, 40 years.

16           MR. GILLIGAN:  Off the top of my head -- well,

17   Mr. Montgomery is a new plaintiff and so, therefore, the

18   facts that he alleges regarding surveillance of him would

19   not, on their face, be evidently related to the prior claims

20   of surveillance involving Mr. Klayman's other clients.

21           THE COURT:  What's the connection to the

22   Section 215 of the PATRIOT Act?  I'm not sure I see that.

23           MR. GILLIGAN:  There is an allegation, Your Honor,

24   to answer your question, in paragraph 20 of the complaint,

25   that the NSA has resurrected a similar bulk telephony

1    metadata program.  But, again, there is no evidence of that

2    presented in support of Mr. Klayman's motion, certainly no

3    facts to substantiate that allegation in the complaint.  And

4    as you point out, it's strictly forbidden by the U.S.A.

5    Freedom Act.  So that would seem to be a frivolous

6    allegation that I don't know that it could support a

7    relatedness designation.

8          However, in Klayman II, the allegation is that

9    surveillance has been conducted of Mr. Klayman and his

10   clients under the NSA's PRISM program.  Paragraph 20 of the

11   complaint does allege surveillance under Section 702, and

12   the recent FISC order that Mr. Klayman alludes to and

13   discusses at some length, and his complaint also involves

14   surveillance under section 702.

15         Although I hasten to point out that --

16         THE COURT:  So there might be overlap there?

17         MR. GILLIGAN:  There may be some overlap there,

18   Your Honor, although if I may point out, just for the

19   record, that FISC order concerned incidents of

20   non-compliance with minimization procedures, incidents, by

21   the way, which were detected and reported by the government

22   to the FISC.

23         Minimization procedures concern the handling of

24   communications after they have been acquired by the

25   government.  And so unless there is some evidence, and there

1    is not, that Mr. Klayman or Mr. Montgomery has been targets

2    of Section 702 surveillance, any problems of compliance with

3    minimization procedures would have no impact on them

4    whatsoever.

5         If the Court were to retain jurisdiction or

6    assignment of this case, again, I would propose that, given

7    the lack of any emergency requiring that the burdens of

8    expedited litigation be placed on Your Honor or us; that we

9    marry up our opposition to this preliminary injunction

10   motion with our motion to dismiss, which would be due on

11   August 7th.

12        THE COURT:  Well, certainly, I'm struggling to see

13   how this could be even fairly considered a TRO application.

14   They sometimes just refer to it generally as TRO/PI.  It

15   seems like more of a PI- than TRO-type case.

16        MR. GILLIGAN:  Correct, Your Honor.

17        THE COURT:  I'm a little hesitant to make that

18   choice, which I have the discretion to make, prior to making

19   the decision about related.

20        If I decide it's not related, then I have to send

21   it back, so to speak, to the wheel.  If I decide that it's

22   sufficiently related to warrant my keeping it, then I would

23   have to decide whether to treat it as a TRO or a PI.

24        At first blush, it seems to me that it's more a

25   PI- than a TRO-type situation.

1          MR. GILLIGAN:  To say the least, Your Honor.

2          THE COURT:  To say the least.

3          Now, we have a 21-day rule to set a hearing for a

4   PI.

5          MR. GILLIGAN:  May I address that point,

6   Your Honor?

7          THE COURT:  Yes, please.  Go ahead.

8          MR. GILLIGAN:  The terms of the rule are that the

9   21-day rule apply upon a showing of facts that make

10  expedition essential, and there is no such showing here.

11  There is a naked but factually unsupported allegation

12  regarding destruction of the hard drives.

13          But, as I have said, we looked into this.  The

14  hard drives are in a secure facility with the intelligence

15  community's Office of Inspector General.  I refer Your Honor

16  to pages 17 and 18 of Mr. Klayman's supporting brief.  It

17  says there that he wants the hard drives turned over to the

18  Inspector General for safekeeping.  Well, that's where they

19  already are.  And, in fact, they have been there since

20  August of last year.  So there is no emergency with respect

21  to the hard drives, there is no evidence of surveillance,

22  there is no basis here for expedition.

23          And regarding the August 7th date, I will say,

24  Your Honor, it is the middle of the summer, people have

25  pre-existing vacation plans, and our team also has

1  pre-existing litigation and other litigation obligations in

2  other active NSA cases.

3        THE COURT:  And remind me again how you picked the

4  7th, is that the --

5        MR. GILLIGAN:  Based on the date of service on the

6  U.S. Attorney's Office of the complaint.

7        And this would be service, again, on the

8  government agency and official-capacity defendants.

9        THE COURT:  So if I were to keep the case, you

10  would propose that that will be the day the government's

11  briefs are due?

12        MR. GILLIGAN:  Yes.

13        THE COURT:  And Mr. Klayman would have whatever

14  time he needs to respond -- to reply to them, I should say.

15        MR. GILLIGAN:  Yes.

16        THE COURT:  Okay.  Thank you, Mr. Gilligan.

17        MR. GILLIGAN:  Thank you, Your Honor.

18        THE COURT:  Mr. Klayman.

19        MR. KLAYMAN:  May I respond?

20        THE COURT:  Of course.

21        MR. KLAYMAN:  I didn't know if I heard

22  Mr. Gilligan say that the video of Mr. Montgomery's

23  interview is also with the Inspector General.

24        MR. GILLIGAN:  I do not know the answer to that

25  question.

1              MR. KLAYMAN:  Yes.  That's crucial, because

2   Mr. Montgomery has a brain aneurysm and he could die.  So

3   I would like them to present an affidavit to this Court.

4              THE COURT:  Is he in the hospital right now?

5              MR. KLAYMAN:  He's been in the hospital numerous

6   times, yes.

7              THE COURT:  All right.

8              MR. KLAYMAN:  And he could go at any moment.  It's

9   not -- his life --

10             THE COURT:  How old a man is he?

11             MR. KLAYMAN:  He's not old.

12             THE COURT:  Roughly.

13             MR. KLAYMAN:  I say he's about 58.

14             THE COURT:  Okay.

15             MR. KLAYMAN:  But that's why I was pushing to get

16  this investigation done at the FBI, and that's why I was

17  communicating with the general counsel.

18             So I would ask this Court to order them to produce

19  a sworn affidavit as to the whereabouts of these hard

20  drives, and also the video deposition under oath to Special

21  Agents Giardina and Barnett.

22             Now, with regard to the immediacy of it, as

23  Your Honor knows, in the landmark case of *United States*

24  *versus Mills*, that's a D.C. Circuit case, 2009, "one day of

25  a constitutional violation is one day too much."  That's

 1   irreparable injury.  So it's not like we can go la-di-da,

 2   la-di-da any law and forget about this thing, because it is

 3   continuing.

 4           Now, Mr. Montgomery submitted an affidavit and I

 5   submitted an affidavit -- testified to the fact that he was

 6   able to determine himself that he was being hacked and

 7   surveilled.  He's an expert at this.

 8           And as we set forth in the affidavit --

 9           THE COURT:  Just give me some rough idea, how did

10   he determine this?

11           MR. KLAYMAN:  Well, you know what?  He is --

12           THE COURT:  Is he a computer person?

13           MR. KLAYMAN:  Yes.

14           THE COURT:  He's an expert in computer technology

15   or IT or something?

16           MR. KLAYMAN:  He is.

17           He's the person, Your Honor, give you just a

18   little brief history.  After 9/11, Mr. Montgomery worked for

19   a company called eTreppid.  The owner was Warren Trepp.

20   Trepp was the owner of a casino in Las Vegas, Nevada.  He

21   developed facial recognition software to surveil people

22   going to the gaming tables.

23           THE COURT:  Card counters?

24           MR. KLAYMAN:  Among other things.

25           THE COURT:  Oh, my goodness.

1          MR. KLAYMAN:  People who could rip off the casino.

2          THE COURT:  I see.

3          MR. KLAYMAN:  Criminals and others.

4          And believe me, there are a lot of criminals in

5   Las Vegas.

6          THE COURT:  Oh, I'm sure.

7          MR. KLAYMAN:  So it was a very good software.

8          The FBI, NSA, and CIA got wind of his technology,

9   and they went out to eTreppid.  And they decided that they

10  could use his expertise to develop software to dis-encrypt

11  the video messages that bin Laden was sending out on

12  Al Jazeera to his troops.

13         And what Montgomery developed was software that

14  could peel back the veneer on these videos, because bin

15  Laden was using them actually to give directions to his

16  so-called terrorist troops.

17         Bin Laden became so -- excuse me.  Montgomery

18  became so well-respected inside of the intelligence agencies

19  that, a national security reporter, James Risen, wrote in a

20  recent book, some of which was accurate, and other,

21  I believe, was designed to discredit Montgomery.  But that

22  he was the franchise, he was the emperor of the war on

23  terror, as Risen put it.  And he could walk into the

24  President's office, or the Vice President's office, because

25  this was getting top priority.

1    And consequently, he's a major player, and he

2    worked closely in this interview.  He testified to the FBI

3    that he'd worked closely with James Clapper, closely with

4    John Brennan, closely with General Alexander and others.

5    And he observed them conducting illegal surveillance on not

6    just Chief Justices of the Supreme Court, other justices,

7    Justice Ginsburg is one example.  156 judges.  President

8    Trump and his family before he became president.  And even

9    yours truly.  They got my stuff in 2007, my banking records

10   in Miami when I was down there.  I've never looked at any of

11   this stuff.  But that's what he testified to.  I was

12   permitted to sit in by the FBI as his attorney.

13   And consequently, Montgomery knows what's going

14   on.  So I had earlier come -- I didn't have the chance to

15   explain in detail before, but I'd actually put him in front

16   of Your Honor in Klayman I and Klayman II, saying he's a

17   material witness.  I had asked you to interview him in

18   camera -- you have a security clearance.  You can listen to

19   him -- before he had more health problems, because he has

20   more information and he has more expertise by a mile than

21   even Edward Snowden.  But he did the right thing.  He didn't

22   flee to Russia.

23   For years, he was trying to come forward to

24   various congressional committee and Inspectors General to

25   blow the whistle.  He filed whistle-blower complaints until

1  he found me.  And that's why this -- there is a tremendous

2  overlap in these cases.

3          THE COURT:  You got access to these documents how,

4  as a contractor?

5          MR. KLAYMAN:  As a contractor, yeah.

6          And that's why I got them immunity.  I do criminal

7  defense work as well as civil work.  I'm more of a civil

8  lawyer, but I do criminal defense.

9          So I got him immunity agreements so he'd come

10  forward and not fear having to produce it and having to

11  testify.

12          THE COURT:  The U.S. Attorney's Office in D.C.?

13          MR. KLAYMAN:  Yes.  And to the FBI.

14          And this was at the highest level.  It was right

15  under Comey.  He was supervising, according to Baker, his

16  general counsel.  Now, they're both gone now because of what

17  happened, obviously.  We don't need to get into that.

18          But there is this direct one-on-one overlap.  And

19  I'm glad that Mr. Gilligan was candid on that and said, yes,

20  we did lead a continuing violation of 215, and we pled 702.

21  And in any event, 702 is part of Klayman II for sure.

22          And these cases are live, even though there were

23  preliminary injunctions issues, they're going forward.  Now,

24  there's an issue, they can go forward and they should go

25  forward.  We ask for preliminary injunctions, and they're

1    continued to violate the law.

2            Your junctions are a lot different than some

3    hapless piece of legislation up on Capitol Hill, where

4    there's no consequence to violating it.  You have contempt

5    powers, Your Honor.  You could bring them back and we can

6    conduct a contempt hearing as to whether or not, in

7    Klayman I and II, these things are continuing.  In addition,

8    in the context of this case.  So that's why consolidation

9    may be appropriate.  They can go on separate tracks now that

10   there's a motion for Temporary Restraining Order and

11   preliminary injunction.

12           But yes, there's an urgency.  *U.S. v. Mills*, one

13   day of a violation of constitutional rights is irreparable

14   injury; it's too much.  This threatens the state of the

15   nation.

16           THE COURT:  Well, as a practical matter, I mean,

17   assuming I were to keep it, for the sake of discussion only,

18   I can't imagine a scenario where there would be a hearing on

19   the PI within a month.

20           MR. KLAYMAN:  Well --

21           THE COURT:  That's end of July.  So at that

22   point --

23           MR. KLAYMAN:  Perhaps, Your Honor, now that we've

24   got -- there was also an allegation in the complaint,

25   because we filed a legitimate Privacy Act request for 302

1   reports of the interviews that Mr. Montgomery gave.  They

2   have Special Agents Giardina and Barnett had to have

3   prepared them, and those should be turned over forthwith.

4           THE COURT:  They had videotapes, I thought you

5   said.

6           MR. KLAYMAN:  Well, they had videotapes.

7           THE COURT:  Right.  So why do they need to do a

8   302 if they have a videotape?  Just do a transcript of the

9   videotape.

10          MR. KLAYMAN:  Well, I don't know what they did.

11  And I would ask Your Honor to order the 302s be turned over,

12  Mr. Montgomery is entitled to them; he was interviewed by

13  them.

14          And you raised a good point:  A copy of the

15  videotape.

16          And Your Honor can keep custody of them.  I trust

17  you.  I do not trust these agencies under the circumstance.

18  I would ask that Your Honor take custody of both the hard

19  drives and the videotape.

20          And you have a security clearance.  And we can

21  craft a procedure when we get to a hearing that if there's

22  classified information, Your Honor could hear it in camera.

23  I don't even have to be there.  I trust you.  I know you're

24  an honorable man.

25          So that's why this case has to move forward.

 1  There is a direct overlap, and I appreciate Mr. Gilligan

 2  admitting that.  And just as a practical matter, it's not a

 3  legal consideration.  It's not legal.  It's not why I signed

 4  it to you initially as related.  But if it goes back into

 5  this courthouse, I'll never see it again, as a reality.

 6          Nothing has come out of this courthouse in years.

 7          THE COURT:  Well --

 8          MR. KLAYMAN:  It's tough, okay?  Politics in this

 9  town is rampant, it's out of control, it's infected the

10  judiciary, it hasn't affected you.

11          THE COURT:  If I had sent it back to the Clerk's

12  Office to be put back in the wheel, so to speak, it could

13  end up with Judge Lamberth.

14          MR. KLAYMAN:  Well, very unlikely.

15          THE COURT:  Judge Lamberth could get it?

16          MR. KLAYMAN:  I don't want to roll the dice.

17          It's not a legal consideration, but it's a

18  practical fact of life that this case will never go anywhere

19  if it goes to anyone other than Lamberth.

20          I can't go to Lamberth, because Lamberth assisted

21  me in taking Montgomery to the FBI.  He would have a

22  conflict on this.

23          THE COURT:  Oh.

24          MR. KLAYMAN:  Okay?

25          And Lamberth himself may have been surveilled.

1          THE COURT:  Do you disagree with the Court that

2    this strikes me at this point as more a PI than a TRO?

3          A TRO, if you even want it, it's only good for 14

4    days.

5          MR. KLAYMAN:  I have no objection, Your Honor, to

6    having this become a PI if Your Honor takes custody of the

7    video and the hard drives and the 302s.  That's what I would

8    ask the Court, take it into its custody, because, yes, there

9    is regrettably -- I didn't coin the phrase, others have --

10   deep state.

11         And things are coming out of this administration

12   that are contrary to the interest of the administration.

13   Their own people that are supposed to work under them, both

14   at the Justice Department and elsewhere, are out there and

15   they're trying to harm this administration.  So why wouldn't

16   they destroy this stuff?  And it deals with former FBI

17   Director Comey.

18         And, in fact, Mr. Montgomery would testify that

19   Robert Mueller, who he worked with, was doing the same

20   thing.  So they both were engaged in illegal surveillance at

21   the FBI.

22         This is a very, very important case.  And if

23   Your Honor does not entertain it, it will never see the

24   light of day, because my experience for the last three

25   months on Capitol Hill, I walked around like a lawyer just

1  out of law school, 30 years old, going around to various

2  congressional offices.  First I met with Congressman Steve

3  King of the judiciary committee.  He put me in touch with

4  Bob Goodlatte.  I talked with his staff.  I laid it out.

5  I had several meetings.

6       I then went to Senator Grassley over at the

7  judiciary committee.  I met with a friend of mine who works

8  for Senator Orrin Hatch.  I hear nothing about that.  I

9  called several times.  I met with them for at least an hour.

10      I then went to Chairman Nunes.  And I met with

11  Ellen Souza, one of his lawyers, and I explained what was at

12  stake, never heard anything.

13      Then I went to Senator Richard Burr's office.

14  He's head of the Senate Intelligence Committee.  Nothing.

15  They don't want to get into this, Your Honor, because

16  they've seen what happens.  If they push, stuff will be out

17  there in the files about their files.  I call it the Anthony

18  Weiner Factor.  So I'm not saying they're like Anthony

19  Weiner, but I'm just saying it's a problem.

20      THE COURT:  Well, I'll tell you what.  I'll noodle

21  it over the weekend.

22      MR. KLAYMAN:  Thank you, Your Honor.

23      But if Your Honor gets --

24      THE COURT:  I'll make a decision Monday whether or

25  not it's related, in my judgment, enough for me to keep it.

1        If I were to decide to keep it, I would set a

2  briefing schedule, and then a hearing, set a hearing.

3        At the moment, I would be inclined, if I were to

4  keep it, to have the hearing in August or something like

5  that and give the government till the date that they

6  requested to file their pleadings and give you a time that's

7  fair for you to reply to whatever they file.

8        And obviously, the Court has to have time to get

9  up to speed with all the briefs.  So I mean, it can't --

10  something like this can't be done overnight, so to speak.

11  And I'll be away for part of August for my annual vacation

12  anyway.

13        So there's lot of moving parts here.  I understand

14  the importance of keeping constitutional violations to a

15  minimum.  The Supreme Court has made that very clear and so

16  has the D.C. Circuit too.  But as it is, if the case were to

17  be on a PI track, it would be getting, by definition,

18  expedited treatment.  That's what it gets:  Expedited

19  treatment.  So I'll let you know Monday, Counsel.

20        MR. KLAYMAN:  Thank you.

21        I would respectfully request -- I'll consent to

22  that Your Honor, if Your Honor will take into custody the

23  hard drives and the video and the 302s.  I would ask that.

24  I can't tell a federal judge what to do, but I can suggest

25  it.

1      THE COURT:  That's a separate question of whether

2  I can even do it.  Assuming I kept it, whether I would even

3  have the authority to order it, let alone whether I should

4  want to do that.

5      I mean, just on the representation of Mr. Gilligan

6  alone, I've dealt with Mr. Gilligan on a number of other

7  cases over the last decade and always find him to be a very

8  honest, straightforward advocate.  If he represents to this

9  Court that they are in a secure facility at the IG's office,

10  I have, A, no reason to doubt him, and I have no reason to

11  believe that they would be in any way at risk.

12      And, of course, if I were to keep the case, I'd

13  make it clear to Mr. Gilligan that the Court expects them to

14  be kept preserved under those circumstances until such time

15  as the Court releases them in any other way, shape or form.

16  I wouldn't let the IG just willy-nilly get rid of them or

17  destroy them, no.

18      So I don't want to get too far ahead of myself

19  here, but in the meantime, you can rest assured if I were to

20  keep the case, that I would direct the government to make

21  sure that they are kept secure until such time as the Court

22  orders otherwise.

23      MR. KLAYMAN:  The video, the hard drives --

24      THE COURT:  Yeah.  Whatever --

25      MR. KLAYMAN:  -- and the 302s.

1          THE COURT:  Whatever the IG has in his custody --

2          MR. KLAYMAN:  Okay.

3          THE COURT:  -- and security.

4          MR. KLAYMAN:  Well, if he doesn't have it,

5    Your Honor, I would ask that he get control of it, if it's

6    somewhere in the FBI's file.

7          THE COURT:  Mr. Gilligan, do you have some update

8    on that issue?

9          MR. GILLIGAN:  I just --

10         THE COURT:  Come on over.

11         MR. GILLIGAN:  I feared, Your Honor, that,

12   perhaps, you and Mr. Klayman were not on the same wave

13   length.  And so to avoid any confusion, it is my information

14   that the Inspector General's Office has the hard drives that

15   Mr. Montgomery turned over to the FBI about two years ago.

16         The videotape, the 302s, I have no reason to

17   believe that they are with the Inspector General.  I believe

18   them to be in the custody of the FBI.

19         I can contact the Bureau, if possible, today, but

20   certainly by Monday to make sure that they're put under an

21   immediate litigation hold, so that there will be no question

22   of that.

23         THE COURT:  Why don't you go ahead and do that

24   anyway --

25         MR. GILLIGAN:  Okay.

 1          THE COURT:  -- regardless of who the judge is that

 2   handles this case.

 3          MR. GILLIGAN:  Absolutely.

 4          THE COURT:  I'm sure that he or she, if it's not

 5   me, would want that to be secured and frozen and protected

 6   in a protected state.

 7          MR. GILLIGAN:  And at this point, Your Honor, I

 8   won't go blow by blow with Mr. Klayman on the number of

 9   representations he's made here today, but for another view

10   of Mr. Montgomery, I can recommend Judge Contreras's

11   decision in *Montgomery versus Risen*, which is reported,

12   I believe, at 197 F.Supp. 3d, either 219 or 319.

13          THE COURT:  We'll find it.

14          MR. KLAYMAN:  Let me add with that, Your Honor, is

15   that that's on appeal, and Judge Contreras inherited that

16   after there was discovery in Miami.  And we will maintain

17   that the intelligence agencies, through Risen, attempted to

18   smear Montgomery, to destroy his credibility as a witness,

19   okay?

20          And Risen has had difficulty in the past.

21   Contreras, and I don't mean any disrespect, he didn't do a

22   good job, he wasn't thorough.  I even asked him for an oral

23   argument, I never got it.  He didn't understand the case.

24          And there is politics in this courthouse,

25   I'm sorry to say.  There is.  So I think that's important.

1          But I want to raise one other thing, is that --

2    service, okay?  Process server, very well-respected process

3    server, same-day service, went out to serve Dan Coats, DNI

4    he was told by the Secret Service, according to process

5    server -- and he's very respectful, I know him, he's a good

6    Christian guy, Tony Snesko -- he was told that if he didn't

7    leave, he would be arrested, okay?  I'll submit an

8    affidavit, okay?

9          We're having problems with service with the

10   individuals.  I appreciate that Mr. Gilligan is here for the

11   government defendants.  We had problems in the other cases.

12         Obama, the same thing.  I sent the process server

13   out there in a number of cases and they said, we want to

14   serve it respectfully.  We're not here to embarrass anybody.

15   And the Secret Service fronts for President Obama and says,

16   I'll get back to you.  But they never get back for service.

17   So I want Your Honor to consider ordering the individuals to

18   accept service, or we can come up with means of service,

19   either publication or whatever the case may be.

20         But this is the attitude that's out there today

21   and why the country is up in arms, because the Washington

22   establishment thinks it's above the law and they can evade

23   service.  I mean, whoever heard of that from cabinet

24   officials?

25         And that's the problem we had in Klayman I.  We

1   thought we served them by Certified Mail.

2          THE COURT:  Well, the only ones of the individuals

3   listed in your complaint that are Cabinet rank -- well,

4   actually, I don't even know if Pompeo is Cabinet rank.  He's

5   the CIA director, obviously.  Clapper is a former government

6   official, right?  He's not currently in office.  Coats,

7   I don't think is Cabinet rank, although he's a current

8   government official.  President Obama is, obviously, a

9   former president.  Brennan is a former CIA director.  Rogers

10  is a current officeholder at NSA.  And Comey is a former FBI

11  director.  So there's really only Rogers, Pompeo, and Coats,

12  only three are current officeholders.  The rest are former

13  officeholders.  Now, the Secret Service would only be

14  protecting, I assume, just one of them, President Obama.

15         MR. KLAYMAN:  That's what I thought, but the

16  process server was told that -- he met with the Secret

17  Service out there, for whatever reason.

18         THE COURT:  When he was trying to serve which one?

19         MR. KLAYMAN:  Yeah.  Coats, as one example.  Dan

20  Coats as one example.

21         THE COURT:  Well, Coats is an officeholder.  And

22  I don't know how security is provided at the moment for the

23  DNI.  It's, obviously, a very high-level position to be the

24  DNI, and I would assume, frankly, that he has a security

25  detail, just like the Director of the FBI has and the

1  Director of the NSA has and the Director of the CIA has.

2  They all have security details protecting them.

3  But Comey is a former officeholder, as is Brennan

4  and Clapper.  So those three, I have no basis to believe

5  they get security details once they leave office.  I have no

6  knowledge of that.

7  President Obama, obviously, does, he's a former

8  President of the United States.

9  MR. KLAYMAN:  Well, that's not the only issue is

10  that Comey is avoiding service of process, and so are some

11  of the others.  We have sent a process server out to his

12  house, and they're told to leave and those kinds of things,

13  okay?  And I think they're not -- they're getting the

14  run-around as to where he lives or where he is.

15  I prefer not to do this.  I actually took the

16  process server to the Comey hearing a few weeks ago and

17  talked to the security of the senate intel committee saying,

18  can we serve him quietly, not embarrass him.  We were told

19  to leave.

20  And then I went to Senator Burr's office and I

21  said, can you have Senator Burr, please advise Mr. Comey

22  that there's a complaint, we want to serve him in a

23  dignified way, and nothing.

24  So it's very tough.  And we know that from Klayman

25  I and II, the Justice Department claimed that we didn't make

1   service on the parties individually.  So we want to bring

2   that to your attention, Your Honor, because in a TRO, we

3   gave him -- we gave him the notice, and we FedExed them the

4   pleadings.  They didn't have the respect, I think, for this

5   Court to show up today because they think they're above the

6   law, and they think they'll get away with it again just like

7   the defendants did in Klayman I and II.

8           So at some point we have to fashion a way to get

9   them served.  And under Rule 4, there are lots of ways we

10  can do that, because their attorneys are publishing it, or

11  Your Honor could even instruct them to accept service.

12          So I wanted to raise that issue.

13          THE COURT:  All right.  Well, let's deal with the

14  first few things and then maybe that'll become a later issue

15  that we have to address.

16          MR. KLAYMAN:  Thank you, Your Honor.  I appreciate

17  your diligence.

18          THE COURT:  All right.  Thank you for coming on

19  such short notice, Counsel.  I appreciate it.

20          MR. KLAYMAN:  You're welcome.

21          THE COURT:  Have a nice weekend.

22          DEPUTY CLERK:  All rise.

23          This Honorable Court will stand in recess until

24  the return of court.

25          (Proceedings concluded at 4:21 p.m.)

# C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date: June 26, 2017_____    /S/__William P. Zaremba_____

William P. Zaremba, RMR, CRR