# EXHIBIT A

1  Ronald J. Logar, Esq., Nevada Bar No.: 0303
   Eric A. Pulver, Esq., Nevada Bar No.: 7874
2  **Law Office of Logar & Pulver, PC**
3  225 S. Arlington Ave., Ste A
   Reno, NV 89501
4  Phone: 775-786-5040; Fax: 775-786-7544
   Michael J. Flynn, Esq., Mass. State Bar No.: 172780
5  Philip H. Stillman, Esq., California State Bar No.: 152861
6  **Flynn & Stillman**
   P.O. Box 690
7  Rancho Santa Fe, CA 92067
   Phone: 858-775-7624; Fax: 858-759-0711
8  *Admitted Pro Hac Vice*

9              UNITED STATES DISTRICT COURT

10           FOR THE DISTRICT OF NEVADA, RENO

11

12  ETREPPID TECHNOLOGIES, INC., a California )   CASES Nos.: 3:06-cv-N-00145-BES-VPC &
13  Corporation,                             )   3:06-cv-N-06-00056-BES-VPC
                                             )
14              Plaintiff,                   )
                                             )
15      vs.                                  )
                                             )
16  DENNIS MONTGOMERY, an individual,        )   **SEALED DECLARATION OF DENNIS**
17  MONTGOMERY FAMILY TRUST, a California )      **MONTGOMERY IN SUPPORT OF HIS**
    Trust and DOES 1 THROUGH 20,             )   **OPPOSITIONS TO DOD'S AND ETREPPID'S**
18                                           )   **MOTIONS FOR PROTECTIVE ORDERS**
                Defendants.                  )
19                                           )
20  ———————————————————————                  )
    DENNIS MONTGOMERY, an individual; and    )
21  MONTGOMERY FAMILY TRUST, a               )   **THIS DECLARATION IS FILED UNDER**
    California Trust,                         )   **SEAL, EX PARTE, AND MAY BE VIEWED**
22              Plaintiffs,                   )   **AND/OR READ ONLY BY U.S. DISTRICT**
23      vs.                                  )   **JUDGE BRIAN E. SANDOVAL**
                                             )
24  eTREPPID TECHNOLOGIES, INC.,             )
25  a Nevada LLC; WARREN TREPP, an           )
    individual; DEPARTMENT OF DEFENSE        )
26  of the UNITED STATES OF AMERICA          )
    and DOES 1 through 10,                   )
27              Defendants.                  )

28

## SEALED DECLARATION OF DENNIS MONTGOMERY

I, Dennis Montgomery, declare:

1.  I am over age 18 and a party to two civil lawsuits involving Warren Trepp and my company eTreppid Technologies.  I have personal knowledge of the facts stated herein, and if called as a witness, I could and would testify competently to them.

### BACKGROUND

2.  I have been a computer programmer since approximately 1978 developing software programs and the source codes for the programs in thousands of different and varied applications, but mostly involving thousands of different programs for "data compression," "pattern recognition," anomaly detection and an "Object Detection System." [1] These include but are not limited to the following:

a. Software programs applicable to medicine, mostly involving "anomaly detection"; and "pattern recognition" and mostly developed between 1981 and 1996. These are my copyrights and/or my copyright derivatives.

b. An "Object Detection System" ("ODS") derived from my copyrights involving anomaly detection and pattern recognition, but having far more universal application and adaptability to many areas other than medicine, mostly developed between 1994 and 1998. These programs constitute the basis for my work on certain special military contracts. There are thousands of software developers who have worked for decades attempting to develop an "ODS" comparable to mine; and I am unaware of anyone who has successfully created such software.

---

[1] I use these terms generically to define the broadest possible genus of software programs relating to this area of software development - sort of like saying "automobiles" as a category of "four wheel powered vehicles." But the different types of "anomaly detection" and "pattern recognition" programs are vastly greater than the types of "automobiles" currently in existence worldwide.

-1-

c. Data compression developed between 1996 and 1998 - conveyed to eTreppid on "CD No.1"; and adapted for use in casino surveillance between 1998 and 2002, pursuant to our business plan at eTreppid.

d. Data compression and pattern recognition programs, developed by me as an independent contractor at eTreppid between 1998 and December 31, 2001 consisting of a part of eTreppid's work relating to casino surveillance - some involving patents assigned by me derived from "CD No. 1"; and other programs not derived from CD No. 1 licensed to eTreppid pursuant to promises made to me by Warren Trepp.

e. Data streaming compression for movies, not contained on "CD No. 1" and mostly developed by me between 1994 and 1998. I discussed these programs with Trepp before execution of the Sept. 28, 1998 "Contribution Agreement" and offered them for Five Million Dollars, which he rejected; and which we again discussed years later in 2002 and 2003 and which he again rejected for Five Million Dollars. In 2003 we also had several conversations about a sale for Ten Million Dollars and/or promises by Trepp of licensing the software as described in my answers to interrogatories attached to my opposition to the Government's and Trepp's motions for protective orders.

f. Multiple software programs developed, owned, possessed and used exclusively by me derived from my "ODS" between 1994 and December 31, 2002, some of the source codes for which are direct derivatives of my copyrights, and which, beginning in November, 2002 , I began to adapt to military applications on behalf of the Department of Defense, the Navy, the Air Force, and the ███████████████████ mostly utilized in the war on terror between March 2003 and the present.

3    The software programs and the source codes owned, possessed and used exclusively by me on behalf of the foregoing Government agencies all derive from my exclusive copyrights generally relating to "anomaly detection" and "pattern recognition," and more specifically relating to

the source codes used in my "ODS;" and derivatives thereof which enabled me to ████████

████████████████████████████████████████████████████████████

Presumably, the sealed Government declaration informs and educates this Court with respect to this aspect of my software technology.

4       Over the 25 years I have been developing software programs, I have collected and stored thousands of different computer files and programs on my computers and on many different types of computer storage media. Some of this collection was stored at my storage facility and some of that was taken and/or damaged by the FBI. I generally store some of the programs and codes I have developed and/or am working on on the computers I am currently using. The Government took my computers during it's raid on my home and storage facility on March 1 and March 3, 2006; and the government's retention of my computers and computer storage files from my home and storage facility has caused me, and will continue to cause me, irreparable harm because its retention affects my livelihood and ability to work. Additionally, as a result of the Government's unconstitutional raid, I do not have access to computer files which would enable me at this time to provide a more detailed chronology of events relating to the SAP I worked on and at issue in these cases. However, since my departure from eTreppid, as recited below, I have been able to reconstruct on new computers specific software programs that I previously used in the ████████

████████████████████████████████████████████████████

████████       I assume this work product or "output" from my software programs, together with my daily interaction with ████████████████████████ is one of the concerns which *must* be recited at least obliquely in the sealed Government declaration.

5.       More recently, notwithstanding the unconstitutional raid perpetrated on my home and storage by Warren Trepp using his political influence with James Gibbons, (Gibbons has admitted making "phone calls" to initiate criminal action against me on behalf of Trepp), Daniel Bogden and

-3-

the local FBI, I have provided the "output" from my decoding programs, without compensation, to our Government in order to stop terrorist attacks and save American lives. My source codes for this decoding technology which derives from my "ODS" are what Trepp and several Government officials were attempting to steal from me when they raided my home.

6.     The Government has now held my computers and storage media for over six months knowing I do not have possession of any "classified information" and knowing that all of the source codes used on the special Government contracts worked on by me at eTreppid Technologies are owned by me. No other person within our Government or at eTreppid has ever had access to the source codes used on the special Government contracts. Anyone who swears under oath to the contrary is lying and/or committing perjury. Obviously, if they did have access to this technology, Trepp would have licensed and/or sold it to the Government for hundreds of millions of dollars. I completely and zealously guarded the secrecy and confidentiality of my source codes used on the special Government contracts at eTreppid, both from the Government, including ▅▅▅▅ and from eTreppid, as the exclusive owner and sole possessor. No person at eTreppid is able, to my knowledge, to create the source codes that I have created having multiple applications in the war on terror and other military uses. Conclusive proof on this issue is established by the recent interception of the attempts by terrorists operating out of London to blow up jetliners originating in London and bound for the US. I gave the appropriate authorities within the US Government accurate and very specific intelligence regarding this terrorist plot, from my "decoding software" as I have done in the past, weeks prior to the arrests by the London authorities - without compensation.

7.     Neither Warren Trepp, nor eTreppid Technologies, nor any person working there have ever owned, possessed or processed "output" from my source codes used in the special Government contracts. Other eTreppid individuals, as well as Government officials identified herein,

-4-

had access to the "output" only after I had processed it.

8.      In September, 2005, Trepp told me that the Government had appropriated One Hundred Million Dollars for the "decoding technology", but he was demanding Five Hundred Million Dollars. Trepp instructed me to stop processing ▮▮▮▮▮▮▮▮▮▮▮▮ "output" on two occasions - first in September, 2004, saying to stop temporarily until he made a deal with the Government to sell a portion of the technology for Five Hundred Million dollars, which I refused. Secondly, about a year later in September 2005, when my conflict with Trepp greatly intensified. On the latter occasion, I told him it was a "hold-up". I refused on both National Security grounds and over Trepp's failure to pay me licensing fees and to resolve our conflict over the split of the proceeds derived from any sale. Trepp had previously acknowledged my ownership of the technology in numerous conversations and promised "to work things out." In September-October, 2005, Trepp said that "our deal" would have to wait because he had other obligations and began to threaten me as our conflict intensified. This ultimately resulted in my departure from eTreppid in January, 2006. Since then I have given the highest levels of our Government vital national security information free of charge while Trepp and his local Government cronies have raided my home and storage and tried to get me indicted.

9.      I was an independent contractor throughout my time at eTreppid, notwithstanding Trepp's attempt to change my status for tax reasons in January 2003. Before that eTreppid even treated me as an independent contractor. But his tax changes attempting to make me an "employee" only reflect what we both knew and what is now obvious to any impartial observer. I owned the technology, it was not developed while I was at eTreppid, and I exclusively controlled it. He was attempting to steal what he refused to pay for, his modus operandi for his entire adult life, as shown by his position as Head Trader for Michael Milken in the "junk bond" scam. While at eTreppid, I fulfilled all of the indicia of an independent contractor even after January, 2003 when

-5-

Trepp realized the value of the technology in the war on terror. No one controlled, instructed,
supervised, or directed my work in the slightest manner - not one aspect of my work was controlled
etc by anyone or anything. Not one part of the source codes I used on "Special Access Programs"
("SAP") was ever created at eTreppid or on eTreppid computers. All codes used on the special
military contracts were created by me at my home or elsewhere. None of the source codes used on
SAP were ever on the premises at eTreppid, nor were any of them ever contained in eTreppid
computers. Almost all of my work on the SAP was done by me in an area occupied by me alone.
Any adaptation or changes to any of the source codes was done at my home.

### The Negroponte Declaration

10.     I have not read the "sealed declaration" filed by the DoD. Therefore, I obviously do not
know it's contents. I have read John Negroponte's "public" declaration. I agree that the facts
involved herein relating to specific military contracts - the "Special Access Programs", ( the "SAP");
and that my software technology used to "process" data and create "output" from that data in "SAP",
involve vital national security concerns, the disclosure of which would cause "exceptionally grave
damage to the national security of the United States." I can only presume that the "sealed
declaration" relates to work I did on SAP, probably without referencing specific individuals that I
worked with from ▇▇▇▇ and without describing precisely what I did. I expect, given the
Government's failure to use certain information that I processed which turned out to be accurate, but
on which the Government failed to act, resulting in multiple civilian and military casualties, that such
information is not in the sealed declaration. As to the information I provided which succeeded ▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ I hope that the Government has
alerted this Court to the exceptional and grave importance of the use of my technology in the war on
terror.

11.     However, I vigorously dispute whether any of the applicable protocols for properly

-6-

classifying either the data I received from the Government, the "processing" I performed, or the "output" I created, was ever properly designated "classified information" by an "Original Classification Authority" pursuant to "The National Security Industrial Program Operating Manual" (The "Manual") *while it was in my exclusive possession, custody and control at eTreppid*. Much of the work I did was simply too urgent and the "output" too vital to conform to any of the Manual protocols, the eTreppid personnell were too incompetent to implement the protocols, the cost was too great, and ███████████ I dealt with did not trust anybody at eTreppid but me - at least that is what several of them said.

12. For security reasons, and because I zealously protected the secrecy of my software source codes from everyone, no other eTreppid employee had access to anything I was working on in connection with "SAP". Indeed, it was commonly discussed with ████████████, that any leak to anyone at eTreppid would cause serious damage to national security. In general, eTreppid employees were too incompetent to be involved, including Sloan Venables and Patty Gray. Nor did ██████ or other Government official have access to the software programs that I used to create the "output" on "SAP." They repeatedly tried to gain access to the source codes and failed; including attempts to "reverse engineer" the "output" but failed. In December, 2003, certain ████████ talked about "just taking it" after I had ████████████████████████████████ ████████████████████████████ as hereinafter described. But I informed them that the programs would self-destruct and that I would "stop processing" the encrypted data from ████████ ████████████ Because of the statements about "just taking it," I informed Warren Trepp and ███████████████████████████████████████ immediately flew to Reno and signed the "Agreement" attached hereto as Exhibit 1, agreeing not to attempt to seize the technology.

13. Much of the "output" was personally hand delivered by me to ████████████ some of whom flew directly to Reno to pick up the "output", and personally watched me "process"

-7-

data, some of which they brought with them. Several of the ███████████ scrutinized me for months and attempted to "look over my shoulder" in order to gain access to the programs I used and how I "processed" the data. Their efforts also failed.

14. Several of the ███████████ told me repeatedly that they did not trust Warren Trepp and that I should never allow him or anyone working for him to gain access to any of the source codes for the programs. They recommended that I insert intrusion devices in to the programs in order to prevent anyone from gaining access to the programs. On several occasions, several ███ ███████████ who I worked with for long and intense weeks at a time, ███████████ ███ told me that they did not trust the FBI, or the National Security Agency, and/or Paul Haraldsen. They knew that I had begun to trust Haraldsen (which proved to be a mistake) and warned me about him. They told me that anyone with "close ties inside the Government" with Warren Trepp was "suspect" because the technology was worth "hundreds of millions" of dollars in the war on terror. At one point, ███████ removed the local FBI from eTreppid's building, and asked them not to return.

15. As to how the Government "classified" it's reports concerning my "output" after it left my possession, I do not know. Presumably, given what I know about the "output" I gave, the Government has internally classified this data without ever giving me copies of that "classified information." I do not have possession of any of those reports.

16 Mr. Negroponte never personally observed the "processing" of data or the creation of my "output." Presumably, he has received either the "output" I created on some form of electronic storage media or reports concerning the same. I was told by numerous officials that the results from my "output" were included in regular "briefings to the President."

17. The work I performed pursuant to "Special Access Programs" on specified military contracts required that I have a "Top Secret" Security Clearance with access to "Special Information Compartmentalized." ("SIC").

### The Application of my "ODS" Technology to Special Access Programs

-8-

18. **Predator Project, USAF - November, 2002.** In October - November, 2002, I developed a software program from my data streaming technology, *not* contained on "CD No. 1" and obviously created when even eTreppid treated me as an independent contractor, for use on the unmanned aerial vehicle, the "Predator." This program enabled the Predator to stream video at a much lower band width than it then used. The work was done pursuant to Contract # 209545S originating in a Top Secret area at Eglin Air Force Base. My contacts included Colonel Rhys Macbeth, Thayne Wescoatt, Debora Moffitt, and Chris Crutchfield. I will need depositions of each of these individuals and others, together with all of the documentation used on the project in order to prove my ownership, possession, custody and control of the technology used, how it was used, how it differed from then existing technology I had transferred to eTreppid "contained on CD No. 1"; and how I adapted my software to the specific application used on Predator. The adaptation process is proof of my ownership and exclusive possession. The foregoing individuals watched me as I demonstrated the application of the technology in the Predator program.

19. **Pointer, Predator, USAF - February, 2003.** Between November 2002 and March, 2003, as a result of my work on the above Predator project, I discussed my object detection system ("ODS") with and/or interacted with numerous Air Force officers, consultants agents and officials, including but not limited to Major Paul Hastert, Capt. Robert Lyons, Col. Rhys Macbeth, Peter Wiedemann, Col. Felder, Matt Belmonte, David Whigham and others in connection with testing to detect and/or track objects while streaming compressed unmanned aerial vehicle "Pointer" video for Predator. Warren Trepp also advised these and other officials that I had developed an "ODS" which could fulfill their tests. Between November, 2002 and January-February, 2003, Trepp explicitly requested me to use my "ODS," which obviously was then completely developed, (when even Trepp treated me as an independent contractor) to prove to the Air Force that I could detect and track objects inside streaming video. He agreed that if I passed the tests, he would "make a deal" with me either to purchase or license my "ODS" technology. The tests were 90% successful. I adapted my

-9-

"ODS" system to use compressed streaming video on an unmanned aerial vehicle "Pointer" to the ground and then to a central location while detecting and tracking objects on the ground. The validation tests were conducted in February, 2003 at Eglin Air Force Base. The dates, results, and testing procedures, together with all of the related documentation and involvement of Government officials all prove my exclusive ownership and possession of the technology. I will require the depositions of at least ten of the Government officials involved, including Col. High of "Big Safari" together with all of the documentation and test results in order to prove my ownership, custody, possession and control of the "ODS". It has a value in excess of Five Hundred Million Dollars. If this case is to proceed, I will provide the specific names of all individuals involved in this project, generally named "USAF UAV Battlelab, Contracts: F08651-03-P- 0182 and 0129. These contracts extended from March 26, 2003 until September 30, 2005, when my conflict with Trepp erupted.

20. **Tracking al Qaeda, USSOCOM and ▮▮ - September, 2003.** By June - September, 2003, my "ODS" had attracted the interest of ▮▮▮ and USSOCOM in connection with using Predator to detect and track specific al Qaeda operatives "in the field", including al Zarquawi, and specific objects related to him such as cars and vans, with "live" video feeds encoded and scanning for objects and people in "real time." My object tracking was placed on a specific number of "DV laptops" used by SOCOM and ▮▮▮▮▮ in the field. I interacted on a regular basis with these operatives in connection with the use and application of my technology. Special servers were installed in the "POC" Predator Operation Command at Nellis Air Force Base and at Fort Bragg to "look for", detect and track specific objects, which were, in fact, positively identified. I worked with many people in "special groups" in ▮▮▮ at Nellis, at Fort Bragg, at Eglin etc in connection with my object tracking system. I will require all of the documentation, and depositions of at least twenty individuals associated with this project, including General Brown, Scott Allen, Mark Race, Michael Holland, Jerry Dvorak, Kenneth Johns, Snake, Lance Lombardo, Sue Griffin, Merv Leavitt. Eric Barnes and Robert Dailey . The contracts, USZA26-03-P-3294 and H92222-04-0006/DO-0001 to

-10-

0004 extended from September, 19, 2003 until September 30, 2005 when my conflict with Trepp erupted.

21. ████████████████████████████████ **- October 28, 2003.** In September, 2003, ████████████████████████████████ to me and asked if I could ████████████████████████ with my technology. I said I would try. In October 2003, I detected ████████████████ and on or about October 28, 2003, I broke the encryption. Soon after I broke the encryption, ████████ ████████████████████████████ as described below.

a. ████████████████ **- November 8, 2003.** On October 28, 2003, the same day I broke the encryption, I gave this "output" to ████ That "output" consisted of ████████ ████████████████████████████████████████ with the associated date of November 8, 2003. On that date, hours before a suicide attack, the US State Department, using my data, issued an urgent warning about an imminent attack. A suicide bomber driving a truck detonated a bomb outside the Complex killing and wounding over one hundred people. I was later told ████████████ that "we" had either failed to follow through quickly enough or that the Saudi's had failed to act. But I have always questioned why the State Department made an urgent public warning just hours before the attack when ████ knew at least 10 days before the attack?

b. **Miscellaneous Targets and Dates - November 2003 to October, 2004.** Within days of the ████████████████████████████ came to me and asked me to start processing all of the data that they had. ████ gave me a list of it's operatives who I dealt with and could call any time day or night. There are 18 names on the list with their home, office cell and pager phone numbers. I will require the depositions of all 18 of these individuals in order to prove my exclusive ownership, custody, possession and preservation of the secrecy of my software. Over the next several months, I undertook the arduous and time consuming task of extracting data from ████

-11-

I decoded ███████████████████████

1  ███████████████████ But ███████ mostly concentrated on ██████████ I was told

2  by several ██████████████ that the "output" I gave them prevented several terrorist attacks in the US.

3  I have a list of the ██████████████████████████████████████████████ I

4  also specifically gave ████████████████████████████████████████████

5

6  ██████████████████████ in those locations. I gave ██████████████████████

7  ███████████████████████████████████████████████████████ I know what

8  documents and electronic media exist in order to prove that my technology decoded the targets well

9  in advance of the bombings. I do not know why the attacks were not prevented. The pressure on me

10  to "process" was extreme. I was openly watched day and night by ██████████ for over a year.

11  c.  **The World Trade Center** ███████████████████ **- January 4, 2004.**   In December,

12  2003, ████████████████████ without disclosing any details ████████. I did so

13

14  and decoded a specific target coordinate in New York. I later learned that ████████ consisted of

15  ██████████████████████████ 2001 and the location I decoded was the World Trade

16  Center in New York. Immediately upon decoding the tape, ██████████████████ told me to

17  destroy all of the work that I had done ██████████ and to never discuss it with anyone, particularly

18  Warren Trepp. ████████ told me that ████████ was concerned that if any leak occurred, I would be

19  subpoened by the 9/11 Commission. He warned me never to trust Trepp, never to give him or his

20  employees access to any of my technology or the "output", and to protect my technology from him

21

22  at all costs. After I ███████████████████████ told me that the technology was so

23  vital to national security that I could never copyright or patent it, and that ████████ was considering

24  "just taking it". At that time, around Christmas, 2003, I placed "intrusion devices" into my software

25  programs to protect them from both the Government and Trepp. Around the same time, the FBI

26  brought in "blade servers" to accelerate the "processing" time. But the FBI got into a conflict with the

27  ████████ over "control" of the entire operation and ████████ forced the FBI to leave the building.  I did

28

-12-

inform Trepp of the "just taking it" conversation with ████ As a result, ████████

████████████████████████████████████ flew to Reno and signed the letter dated

January 4, 2004, attached hereto as Exhibit 1. At that time, ████████ said ████ would

purchase the technology. Trepp then gave him the price of Five Hundred Million Dollars.

████████ said to keep "processing" and that he would initiate a purchase plan.

d. ████████████████████████████ In February, 2004, working with rotating ████

████████ I started taking data directly from ██████████████████████████████

████████████████████████████████████████████████████████████████

████████████ I had discussions with ████████ including Peter Wiedemann and others,

including Paul Haraldsen (who I believed at that time was some sort of liason between ████ and

NSA) about ████████████████████████████████████ and I explained in

detail what I believed was the technique used, and a specific technique that would make the

encoding even harder to break. Shortly after one of these discussions, ████████████████

████████████████████████ which I again broke. These changes were explicitly discussed with

Wiedemann, ████ and Paul Haraldsen. On June 28, 2004, ████████████████████

████ matching the exact technique that was discussed four months earlier. I discussed these

matters in detail with Haraldsen.

22. **Paul Haraldsen and the Air Force Take Over - The Christmas Eve Bombing.**

Between June 2004 and December, 2004, Paul Haraldsen emerged as my primary contact.

Haraldsen repeatedly informed me that it was very difficult to know "who to trust", that he worked

directly for the "highest level" of our Government, that he worked with General Bath, and to trust him

alone. He told me that there was a conflict "on the inside" and that the Air Force would be taking

over the project at the end of 2004. After June, 2004, Haraldsen told me that I should give him all of

my "output", which I did on a weekly basis. On December 14, 2004, I provided "output" to Haraldsen

and Paul Allen from USSOCOM with target coordinates and the date of December 24th, 2004 -

-13-

Christmas Eve - for a specific location in the middle of one of our military bases in Mosul, Iraq. I then picked up repeated patterns for that location, so on December 20, 2004, I called my contact directly in Iraq and warned him of an impending attack at that location. I repeatedly stressed to Haraldsen that I thought an attack was imminent. On December 24, 2004, a suicide bomber detonated a device on the base killing over 20 people. Around that time, Haraldsen told me that all future funding would come from the Air Force and that a "buy out" would be coordinated by him and other Air Force officials, including General Bath. At one time, he mentioned that One Hundred Million Dollars had already been approved and that he and Bath "were working with Trepp". Later, in mid 2005, I informed him that I did not trust Trepp, that the technology was mine, that the Government needed to deal with me, not Trepp, and that I wanted to participate in any discussions. Haraldsen said he would take it up with the right people inside the Air Force.

23.  **Independent Corroboration of** ████████████████ In early 2005, the Air Force contracted with an independent consulting contractor who verified that there was, in fact, ████████████████████████████████ but that the consultant was unable to decode the encryptions. Some months later, Haraldsen informed me that the "buy out" would go forward and that I would participate.

24.  **The "Eagle Vision" Contract, James Gibbons, and "LLH & Associates".** In early 2005, James Gibbons, working with General Bath procured a military contract, the only contract referenced in eTreppid's "Trade Secret" law suit against me, but merely one of many contracts I worked on with my technology. The project was named "Eagle Vision" and involved the compression of digital satellite streams. LLH & Associates was the primary contractor on this contract, which sub-contracted the work to eTreppid. I believe the contract was a "Secret" contract. In order to prove my exclusive ownership of the technology involved in Eagle Vision and differentiate it from any of the technology on "CD No. 1," I will require the depositions of all individuals involved in this project, together with all of the documentation. I believe that Trepp probably identified this sole

-14-

contract in his Complaint without specifically identifying it as a military contract, but as an "LLH" contract because during this time frame Trepp was actively using other eTreppid employees to attempt to gain access to my codes through reverse engineering and our conflict was rapidly intensifying. The national security concerns expressed in the Negroponte declaration apply to "Eagle Vision."

25. **Detecting and Tracking Submarines.** In mid 2005, I was approached by Michael Carter from the Naval Research Center. He provide me several high altitude satellite photographs of the ocean and asked if I could detect any "anomalies" with my "ODS". The area covered approximately 100 square miles of ocean. I detected two objects in the photographs and reported them to Carter and to Paul Salvatori who reported them to other Navy officials. Carter and Salvatori told me that this was the first time software technology had detected a "submarine under water". They then told me that the Navy would set up a series of tests and that the most difficult test would be in September, 2005. Between September and October, 2005, I used my technology to perform the tests. I was told that the tests were "remarkably accurate" and that the Navy intended to purchase the technology as soon as possible. In October, 2005, Paul Haraldsen informed me that he was negotiating with Trepp and understood that Trepp and I were in some type of conflict. He assured me that my interests would be protected and acknowledged that the technology was mine. Haraldsen said One Hundred Million Dollars had already been approved for the technology. In September through December, 2005, Trepp began to pressure me for the source codes for my "ODS", which, of course, I had always protected from everyone. When I refused to give Trepp the codes, he began to threaten me with using his "political influence" with Gibbons to "bury me"; and to use his "connections" to the Bonnano family, as hereinafter described. A detailed description of my conflict with Trepp is contained in my answers to Trepp's interrogatories, attached to my opposition to the motion for a protective order.

26. In order to prove my *exclusive* ownership, possession, custody and control of my

technology used with ▮▮▮ the Air force, the Navy and USSOCOM, and the preservation of the secrecy of the technology from Trepp, the Government and all eTreppid employees, and in order to defend against Trepp's spurious Trade Secret claims requiring preservation of the secrecy of the "trade secret", *by me alone,* I will have to discover all of the relevant documents, and depose all of the involved individuals from ▮▮▮ the Air Force, USSOCOM, and the Navy relating to the use and application of my technology as recited above. These include but are not limited to: Paul Haraldsen, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Peter Wiedemann, all individuals listed on the list given to me by ▮▮▮▮▮▮▮▮▮▮▮ and all of my contacts in Iraq and in the US relating to the London, Madrid and the Iraq bombings, James Gibbons, Ronald Bath, individuals inside the Air Force involved with Bath and Gibbons and all others inside the Government who tried to steal my technology at the behest of Trepp, Bath, Haraldsen and Gibbons. I will require the "regular briefings" given to the President in order to determine how my technology was described and characterized, how it was used and applied, and to calculate all my damages resulting from the failure of the Government to pay me royalties knowing it belonged to me.

## The DoJ's Use of the "Big Safari" Contract to Permit Discovery is a Ruse.

27.     The DoJ and Ms. Wells in their motion for a protective order, refer to their agreement to allow discovery in connection with the "Big Safari " contract. This is just a ruse. That contract and the discovery they plainly intend to allow relates to the purchase of air conditioners for the "blade servers" brought in by the FBI. That contract has no national security implications and none relating to the ownership and possession of my technology. Referencing it as an example of how and why discovery can proceed in these matters is disingenuous in the extreme.

## Sealed Search Warrant Matters Relevant to National Security Issues

28.     Each and every relevant and material  fact in Agent West's affidavit filed in Court to obtain a search warrant to raid my home and storage are materially false either by intentional deletion, omission, mis-statement, or outright fabrication.  The local Reno FBI raided my home on

the pretext that I had unlawfully taken "classified information" which posed a threat to our "national security." This was just a bold-faced fabrication to justify the theft of the technology I have described herein. Paul Haraldsen knew that the so-called "palm trees" tapes - the pretext for the raid - were neither "classified" or "taken" by me. The FBI, Haraldsen, and Trepp all knew that I had only conveyed to eTreppid - the  Company *I own* with Trepp, and now others, (that Trepp has mysteriously and questionably brought in, including Michael Milken),  the data compression technology  "contained on CD No. 1".  Yet West *deleted* this phrase from his affidavit, then omitted the very next paragraph reciting that none of my other technologies were conveyed.   Then he explicitly deleted the phrase in eTreppid's "Operating Agreement" proving that I was not subject to a non-compete agreement and stated in his affidavit that I was. Then he swore under oath that I was an "employee" from 2000 to November, 2001 when I "assigned" the patents he lists - a complete falsehood; and he recites that Venables had access to my source codes when Venables had admitted under oath three weeks before that he didn't. Now, the Government is asserting the state secrets privilege in the civil cases after admitting in the criminal matter that no "classified information" was "stored" at eTreppid" and thus, I was not in possession of any. Yet, in these civil cases it is representing to the Court that "information" involved in these cases involves an "exceptionally grave danger to the national security of the United States." I do not believe that the upper levels of our Government, including John Negroponte, have been fully advised of the machinations and illegal conduct of Gibbons, Trepp and the local FBI, or of the issues involved in these matters, and that the local Nevada Government authorities aided my home because of the political influence of Trepp. Perhaps, this explains the apparent discrepancy between the Negroponte "public declaration" and the DoJ's motion for a protective order. I raise these search matter issues herein as an explanation for the discrepancy. I have potential claims arising out of the misconduct of the local Nevada officials.

29.    Agent West falsely led the Court issuing the search warrants to believe that there was a

-17-

non-compete agreement then in existence preventing me from using *my* source codes "in competition" with eTreppid, knowingly deleting the explicit phrase stating that there was no non-compete agreement. Again, this conduct was material and intentional to steal my technology.

30.     I have never received any form of notice whatsoever from any Governmental agency that my "Top Secret SIC" security clearance has been suspended or revoked. My security clearance can only be revoked by the appropriate Governmental agency. Yet, Agent West falsely stated in his search affidavit that my clearance had been suspended and that eTreppid possessed a clearance to store "classified information". These compounded falsehoods were manufactured by Trepp, Patty Gray, Sloan Venables and West in order to raid my home on the false allegation that I "unlawfully retained classified information". After being challenged with my Rule 41 (g) Motion, as stated above, the Government then admitted that there was no "classified information" taken by me or in the possession of eTreppid. In the event these cases proceed, I will continue to make decisions and utilize the "information" referenced in paragraph 11 of the Negroponte declaration based on my possession of a "Top Secret SIC" security clearance.

31.     I view the search warrant lies and illegal conduct by my Government to be a result of the local political "connections" between Trepp, James Gibbons, Daniel Bogden, and Ronald Bath, but I do not know how far this corruption rises inside our Government. I have reason to believe that certain high level Government officials, including, the President, Vice-President, Mr. Negroponte and others have *not* been influenced by the political power of Trepp; but I also have reason to believe that some Air Force officials have been influenced by Ronald Bath, and that they have influenced others in the DoJ.

32.     Warren Trepp is an extremely powerful and "connected" individual in Nevada due to his large political contributions. I have attended functions, a cruise, dinners, etc with Trepp and James Gibbons. I have observed Trepp, once heavily intoxicated on a cruise, give Gibbons very large amounts of casino chips and cash. I have heard them discuss "funneling" money in $10,000

-18-

dollar increments to Gibbons thru Trepp's various entities. I have heard Gibbons say words to the effect that given Trepp's questionable background and the "source" of his donations, the less people identify Trepp as one of his donors the better.

33.     Trepp is also a long term close associate of the Bonanno Family of the New Jersey mob family bearing that name - dating back to at least Trepp's Drexel days when Trepp and Michael Milken, who went to prison in connection with his "junk bond" scams, "invested" money for the Bonannos. Trepp threatened me with the Bonannos and I have fears for my life because of that association. The Bonanno's have close ties to Jack Abramoff, the Republican fund raiser, as does Warren Trepp.

34.     I have participated in numerous meetings with Air Force General Ronald Bath, Trepp's "consultant" and Trepp. Gibbons and Bath, both Air Force and Nevada Air National Guard pilots are the basis for Trepp's political influence in Nevada and within the Air Force. In November, 2005, in one of my many fights with Trepp over licensing my technology used in the special Government contracts, Trepp threatened to " bury me" with his political influence over Bath and Gibbons. I believe the FBI/Air Force raid on my home and property was the result of that influence to steal my technology for Trepp. Gibbons has admitted that he initiated the criminal investigation against me.

### Claims I Intend to Bring Not Yet Filed

35.     The fact that Trepp and Gibbons improperly influenced the FBI to raid my home and that they have continued to conduct "surveillance" on me, including what I believe to be illegal physical and electronic surveillance, including eavesdropping and wiretapping, leads me to believe that they have used their secret surveillance program on AT&T customers to intercept my phone records. I have been an AT&T customer. If this litigation is to proceed, I will intervene in the case of *Hepting* v *AT&T* as a Plaintiff against AT&T and the Government. I will also bring claims similar to those brought in the AT&T case in this Court. In that action, I understand that the Government intervened and sought to dismiss the case based on the state secrets privilege.

36. I also intend to bring claims under the "Federal Tort Claims Act"; and I intend to file claims against various state and federal officers and employees in connection with the matters set forth herein.

37. At this point, given the unconstitutional raid on my home, which had a severely damaging effect on my wife of 32 years and three children, I do not trust the State of Nevada, I do not trust the US Government or any of it's branches, agencies, divisions or departments. I am certain that Gibbons, Bath, Haraldsen and others have used their political influence to corrupt the system; but I am hopeful that the Judges hearing this matter will follow the law and apply the law to the facts

I declare under penalty of perjury under the laws of the United States and the State of Nevada that the foregoing is true and correct. Signed this 30th day of October, 2006 in Seattle, Washington..

Dennis Montgomery

-20-

36.     I also intend to bring claims under the "Federal Tort Claims Act"; and I intend to file claims against various state and federal officers and employees in connection with the matters set forth herein.

37.     At this point, given the unconstitutional raid on my home, which had a severely damaging effect on my wife of 32 years and three children, I do not trust the State of Nevada, I do not trust the US Government or any of it's branches, agencies, divisions or departments. I am certain that Gibbons, Bath, Haraldsen and others have used their political influence to corrupt the system; but I am hopeful that the Judges hearing this matter will follow the law and apply the law to the facts.

I declare under penalty of perjury under the laws of the United States and the State of Nevada that the foregoing is true and correct.  Signed this 30th day of October, 2006 in Seattle, Washington..

_____
Dennis Montgomery

-20-



# eTreppid Technologies, LLC

755 Trademark Drive
Reno, NV 89521

www.eTreppid.com

Tel: (775) 337-6771
Fax: (775) 337-1877

January 12, 2004

To whom it may concern,

For about four months eTreppid Technologies, LLC (the "Company") has been providing assistance and information (including that related to the Company's technology, know-how, business and processes) pursuant to an agreement with ▮▮▮▮ (the "Government"). As part of the consideration for providing such assistance and information, the Government agreed that eTreppid Technologies' identity as a contractor and source of the assistance and information as well as the information supplied by the Company would be kept confidential, would only be disclosed to individuals within the government on a need to know basis only, and would not be revealed to the public under the Freedom of Information Act or otherwise. The purpose of this letter agreement is to confirm in writing the understanding between the parties.

It is our current intent to continue to work with the Government with regard to this matter. This will confirm that the U.S. Government agrees not to make any attempt to unilaterally use or otherwise take technology, intellectual property or other property or assets owned by eTreppid Technologies. In addition, the Government agrees that it will negotiate in good faith an agreement that sets forth future services (including technology and intellectual property) to be provided by the Company and the compensation to be paid for such future services as well as services already rendered.

eTreppid Technologies, LLC

By: Warren Trepp, CEO

US Government

By:



*"bringing digital to life"*