## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DENNIS L. MONTGOMERY
LARRY KLAYMAN,

               Plaintiffs,

v.

JAMES COMEY,
JAMES CLAPPER,
JOHN BRENNAN
BARACK OBAMA ET AL.

               Defendants.

**Case No: 17-cv-1074**

---

### PLAINTIFFS' OPPOSITION TO INDIVIDUAL-CAPACITY DEFENDANTS' MOTION TO DISMISS

Plaintiffs' Larry Klayman and Dennis Montgomery ("Plaintiffs" unless individually named) respectfully submit this Memorandum of Law in Opposition to the Individual-Capacity Defendants' ("Individual-Capacity Defendants" including James Comey, Michael Rogers, John Brennan, Mike Pompeo, James Clapper, Dan Coats and former President Barack Obama) Motion to Dismiss the Complaint. Plaintiffs fully incorporate herein their Opposition to the Government Defendants' Motion to Dismiss filed on August 17, 2017.

Dated: October 10, 2017

               Respectfully submitted,

               */s/ Larry Klayman*
               Larry Klayman, Esq.
               KLAYMAN LAW GROUP, P.A.
               D.C. Bar No. 334581
               2020 Pennsylvania Ave. #800
               Washington, D.C. 20006
               Email: leklayman@gmail.com

# **TABLE OF CONTENTS**

Introduction and Preliminary Statement .................................................................1

Legal Standard ..........................................................................................................8

The Law ...................................................................................................................11

    Plaintiffs' Sufficiently Alleged And Pled Standing And The Defendants' Contention Otherwise Is Demonstrably False ...............................................12

    The Allegations In the Complaint Support a *Bivens* Claim ...............................17

        Alternative Process Cannot Remedy Plaintiffs' Inflictions ...................20

        No Viable "Special Factors" Exist to Warrant the Exclusion of a *Bivens* Remedy ...............................................................................................22

    The Individual-Capacity Defendants Are Not Entitled To Qualified Immunity Because When They Violated Plaintiffs' Rights, They Acted Outside Their Discretion as Federal Officers ...............................................................................24

    In the Unlikely Event This Court Concludes That the Individual-Capacity Defendants Acted Within Their Discretion as Federal Officers When They Violated Plaintiffs' Rights, the Individual-Capacity Defendants Are Still Not Entitled to Qualified Immunity Because Plaintiffs' Stated Valid Claims That the Individual-Capacity Defendants Violated and Those Violated Rights Were Clearly Established .......................................29

        Plaintiffs' Allegations Are Sufficient to Overcome Any Alleged Qualified Immunity Because Plaintiffs' Have Stated Valid Claims for the Individual-Capacity Defendants' Various Violations ...........................................30

        Plaintiffs' Allegations Are Sufficient to Show That the Individual-Capacity Defendants Violated Plaintiffs' Clearly Established Rights .................................32

            Plaintiffs' Rights Were Sufficiently Clear When the Individual-Capacity Defendants Violated Them .......................................32

            A Reasonable Official in the Individual-Capacity Defendants' Position Would Have Understood That Their Misconduct Violated That Right.....34

    Former President Obama Is Not Entitled To Absolute Immunity Because The Damages Plaintiffs Suffered Were Not Predicated On His Official Acts .........35

    Plaintiffs Properly Served Former President Obama .......................................36

    Former FBI Director James Comey is not Entitled to Absolute or Qualified Immunity...37

    The Issue of the Individual-Capacity Defendants' Alleged Qualified Immunity Must Ultimately be Determined After Discovery .......................................38

Conclusion ..............................................................................................................40

# TABLE OF AUTHORITIES

*Cases*

*Aktieselskabet v. Fame Jeans, Inc.*, 525 F.3d 8 (D.C. Cir. 2008) ...................................................10

*Anderson v. Creighton*, 483 U.S. 635 (1987) .....................................................................32, 34, 39

*Arnold v. United States*, 816 F.2d 1306 (9th Cir. 1987) .............................................................24

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ...........................................................................29, 32

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ........................................................................9, 10, 30

*Bagola v. Kindt*, 131 F.3d 632, 637 (7th Cir. 1997) ..................................................................18

*Baum v. United States*, 986 F.2d 716 (4th Cir. 1993) ..................................................................25

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ..........................................................9, 10, 11

*Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971)...........................................17, 18, 20

*Brown v. Nationsbank Corp.*, 188 F.3d 579 (5th Cir. 1999)..........................................................18

*Butz v. Economou*, 438 U.S. 478 (1978).........................................................................18, 24

*Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013) ...............................................................12

*Clinton v. Jones*, 520 U.S. 681 (1997).....................................................................................35

*Cotrell, Ltd. V. Biotrol Int'l, Inc.*, 191 F.3d 1248 (10th Cir. 1999) .............................................10

*Crawford v. Britton*, 523 U.S. 574 (1998) ...........................................................................31, 39

*Davis v. FEC*, 554 U.S. 724 (2008) ........................................................................................12

*Espinosa v. City & County of San Francisco*, 598 F.3d 528 (9th Cir. 2010) ...............................34

*Halperin v. Kissinger*, 606 F.2d 1192, 1210-11 (D.C. Cir. 1979) ...............................................35

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ...............................................................30, 32, 33, 39

*Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004) ......................................................26, 27, 28

*Hope v. Pelzer*, 536 U.S. 730 (2002) ..................................................................................33, 34

*Jerome Stevens Pharm., Inc., v. FDA*, 402 F.3d 1249 (D.C. Cir. 2005)..........................................9

*Lassiter v. Alabama A. & M. Univ.*, 28 F.3d 1146 (11th Cir. 1994)...........................................33

*Kartesva vc. Dep't of State*, 37 F.3d 1524 (D.C. Cir. 1995)........................................................38

*Kelley v. FBI*, 67 F. Supp. 3d 240 (D.D.C. 2014).......................................................................21

*Loumiet v. United States*, 968 F. Supp. 2d 142 (D.D.C. 2013)....................................................29

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 1992).....................................................................9

*McKinney v. Whitfield*, 736 F.2d 766 (D.C. Cir. 1984) ......................................................24, 25, 26

*Medina v. United States*, 259 F.3d 220 (4th Cir. 2001) ................................................................25

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009) ....................................40

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ..............................................................38

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)........................................12

*Mountain States Legal found. v. Glickman*, 92 F.3d 1228 (D.C. Cir. 1996) ...............12

*NAACP cv. Ala. Ex rel. Patterson*, 357 U.S. 449 (1958)............................................19

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982)................................................................35

*Pearson v. Callahan*, 555 U.S. 223 (2009)........................................................30, 34

*Perkins v. United States*, 55 F.3d 910 (4th Cir. 1995) ..............................................25

*Rochin v. California*, 342 U.S. 165 (1952) ........................................................18, 19

*Saucier v. Katz*, 533 U.S. 194 (2001) ..........................................................30, 32, 34

*Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18 (D.D.C. 2000)................9

*Sparrow v. United Air Lines, Inc*., 216 F.3d 1111 (D.C. Cir. 2000).............................9

*Swierkiewicz v. Sorema N.A*., 534 U.S. 506 (2002)..................................................10

*Taylor v. FDIC*, 132 F.3d 753 (D.C. Cir. 1997) ......................................................30

*Thomas v. Shinseki*, 657 F. Supp. 2d 74 (2009)......................................................30

*Trulock v. Freeh*, 275 F.3d 391 (4th Cir. 2001).......................................................25

*United States v. Gaubert*, 499 U.S. 315 (1991) .................................................24, 28

*United States v. Jones*, 132 S. Ct. 945 (2012)...........................................................19

*Wilson v. Cagle*, 711 F. Supp. 1521 N.D. Cal. 1988) ...............................................24

*Wilkie v. Robbins*, 551 U.S. 537 (2007)..................................................................17

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) ..........................................................21, 22

<u>Statutes</u>

Fed R. Civ. P 4(e)(2)(C) ...........................................................................................36

Fed R. Civ. P 8(a)(2)............................................................................................9, 11

Fed R. Civ. P 12(b)(1)...........................................................................................8, 9

Fed R. Civ. P 12(b)(5).............................................................................................8

Fed R. Civ. P 12(b)(6)...........................................................................................8, 9

The Foreign Intelligence Surveillance Act .................................................................20

The Stored Communications Act ..............................................................................20

The Wiretap Act.....................................................................................................20

Ala. Code § 16-6B-2(h) ....................................................................................27, 28

Ala. Code § 16-43 .................................................................................................27

## I.     **INTRODUCTION AND PRELIMINARY STATEMENT**

This case is based on a continuation of the Individual-Capacity Defendants' ongoing and continued pattern and practice of conducting mass-scale illegal and unconstitutional surveillance of millions of Americans, including, but not limited to Plaintiffs Dennis Montgomery and Larry Klayman. As this Court has already recognized, this is again the case at the pinnacle of national importance, perhaps <u>even more so</u> than in *Klayman I and Klayman II*, given the fact that the Individual-Capacity Defendants have again simply gone about continuing their massive illegal and unconstitutional surveillance, despite the enactment of the USA FREEDOM Act and prior orders by this Court in ongoing related cases. Thus, it is abundantly clear that the Individual-Capacity Defendants have no regard for this Court's previous orders, the U.S. Constitution, or the law in general. It is therefore incumbent upon this Court to, once again, as it has done in the past, "remind" the Individual-Capacity Defendants that they are not above the law and that there will be repercussions to their willful disregard of the U.S. Constitution. As such, preliminary injunctive relief is absolutely necessary – once again – so that this Court may persevere the status quo of simply obeying the law and monitor the conduct of Defendants and hold them in contempt for any further violations, should they choose to continue their lawless behavior. Plaintiffs, having waived their motion for temporary restraining order, upon the commitment of this Court to expeditiously move this case along to a preliminary injunction hearing, then moved for expedited discovery, since the individual and government Defendants continue to falsely deny their illegal and unconstitutional violations of the First and Fourth Amendment. This request for discovery is absolutely necessary given the Defendants' documented history of lying and deceit furthered by their counsel at the U.S. Department of Justice. It has been shown that over 97% of lawyers of the U.S. Department of Justice are sympathetic and to – and willing to

provide cover for – the majority of these Defendants as they have voted for and donated to the campaigns of President Barack Obama and former U.S. Secretary of State Hillary Clinton. *See* http://thehill.com/homenews/campaign/302817-government-workers-shun-trump-give-big-money-to-clinton-campaign.[1]

As Plaintiff Klayman argued in front of this Court on November 18, 2013 in *Klayman I*, "[w]e have never seen in the history of this country this kind of violation of the privacy rights of the American citizens. We live in an Orwellian state." *Klayman I*, ECF No. 41 at 17. This Court concurred, finding, "…the almost-Orwellian technology that enables the Government to store and analyze the phone metadata of every telephone user in the United States is unlike anything that could have been conceived in 1979." *Klayman I*, ECF No. 48 at 49. *See also id*. at 41 ("…empower the government to conduct wide-ranging 'DNA dragnets' that raise justifiable citations to George Orwell"). Much to Plaintiffs' dismay, but – unfortunately – not to anyone's surprise, the "almost-Orwellian" state unmasked by this Court just four years ago has come to near fruition, given that new and uncontroverted continuing disclosures regarding the massive extent the government's illegal and unconstitutional surveillance schemes are emerging nearly every single day and implicating more and more people and agencies. For instance, as detailed in Plaintiffs' Supplement to Reply to Defendants' Opposition to Motion for Expedited Discovery, filed on July 31, 2017, it was disclosed by Circa News that James Baker – general counsel for Defendant Federal Bureau of Investigation ("FBI") – whom Plaintiffs had been personally assured by that Defendant Comey would be taking 'hands on' supervision and conducting the

---

[1] In *Texas, et al v. United States of America*, 14-cv-00254, the Honorable Andrew Hanen of the U.S. District Court for the Southern District of Texas sanctioned attorneys in the Federal Programs Branch for lying on behalf of President Obama in defense of the former president's executive order granting amnesty to over 5 million illegal aliens. *Id*. at ECF No. 347. He wrote "[c]learly, there seems to be a lack of knowledge about or adherence to the duties of professional responsibility in the halls of the Justice Department." *Id*. at p. 22. At least one of the U.S. Department of Justice counsel of record in this case participated in the case before Judge Hanen.

FBI's Montgomery investigation, given its importance," Comp. at 4, was himself implicit and engaged in Defendants' ongoing pattern and practice of conducting illegal, unconstitutional surveillance and subsequently lying and violating privacy rights to cover up their gross illegalities.

Regrettably, the gross illegality that has been revealed recently is nothing new. The Individual-Capacity Defendants have been engaged in this exact type of illegal and unconstitutional behavior for years, completely undeterred by – and defiantly thumbing their noses at – court orders, the law, or any other purported restriction. For instance, in 2014, the Honorable Reggie Walton ("Judge Walton"), who is also a member of this Court, wrote a scathing opinion and order, accusing intelligence agencies of callous and lawless disregard for the truth and the law, while he sat on the Foreign Intelligence Services Court. ("FISC"). *Klayman I*, ECF No. 182 Ex. A (the "Walton Order"). Judge Walton scrutinized the blatant misrepresentations by the NSA and other intelligence agencies, to the FISC court regarding whether certain parties had made requests to have their collected metadata preserved for litigation. Despite the fact that the parties, Jewel and First Unitarian, had contacted the government and made a "specific request" that the government inform the FISC of their existence, the government lies in a later pleading, stating that the parties "did not make a 'specific request' that the government inform this Court about the preservation orders…." Walton Order at 7. Judge Walton uncovered the U.S. Department of Justice's deception, stating that, "[a]s the government is aware, it has a heightened duty of candor to the Court in *ex parte* proceedings.  Regardless of the government's perception of the materiality of the preservation orders in Jewel and Shubert to its February 25 Motion, the government was on notice, as of February 26, 2014, that the plaintiffs in Jewel and First Unitarian believed that orders issued by

the U.S. District Court for the Northern District of California required the preservation of the FISA telephony metadata at issue in the government's February 25 Motion." Walton Order at 8.

The government, upon learning this information, should have made the FISC aware of the preservation orders and of the plaintiffs' understanding of their scope, regardless of whether the plaintiffs had made a "specific request" that the FISC be so advised. Not only did the government fail to do so, but also the <u>E-mail Correspondence suggests that on February 28, 2014, the government sought to dissuade plaintiffs' counsel from immediately raising this issue with the FISC or the Northern District of California.</u>  Walton Order at 8-9 (emphasis added). Thus, as Judge Walton found, not only did the U.S. Department of Justice, in representing the intelligence agencies, blatantly attempt to deceive the court regarding its preservation obligations, it actively tried to cover up its deception by trying to "dissuade plaintiffs' counsel from immediately raising this issue." Walton Order at 9. This clearly demonstrates the lengths to which the intelligence agencies and the FBI are willing to go to, and in this case, destroy data that might be used as evidence of their illegal activities against them.

Incredibly, this was not even the first time that Defendants were caught lying before Judge Walton. In an order issued on March 2, 2013, questioning the credibility, trustworthiness, and ability for Defendants to fully comply with court orders, Judge Walton held:

> [I]n light of the scale of this bulk [telephone records] collection program, the Court must rely heavily on the government to monitor this program to ensure that it continues to be justified...and that it is being implemented in a manner that protects the privacy interests of U.S. persons as required by applicable minimization procedures. <u>To approve such a program, the Court must have every confidence that the government is doing its utmost to ensure that those responsible for implementation fully comply with the Court's orders. The Court no longer has such confidence</u>." (emphasis added). *In Re Production of Tangible Things* [Redacted], Dkt. No: BR. 08-13 (FISA Ct. March 2, 2009).

Furthermore, Defendant Clapper, former Director of the Defense Intelligence Agency, has already gone so far as to brazenly lie in front of Congress regarding the NSA's pattern and practice of running rampant through the constitutional rights of Americans and illegally conducting massive spying operations.[2] Such a blatant and brazen lie under oath – otherwise known as perjury – is indicative of the intelligence agencies' and the FBI's pattern and practice of dishonest and lying behavior, which has led for critics, such as Sen. Rand Paul to call for Clapper's resignation over the incident, which "amounts to perjury."[3] Most recently, Individual-Capacity Defendant Clapper predictably lied again, attacking President Trump and stating falsely in television interviews that there was no evidence that the Trump Tower was surveilled by the FBI or the intelligence agencies. http://www.cnn.com/videos/politics/2017/08/23/trump-phoenix-speech-clapper-presidential-fitness-ctn-sot.cnn; http://www.sanluisobispo.com/opinion/letters-to-the-editor/article151769462.html.

Now, it has been confirmed that the Individual-Capacity Defendants have continued their pattern and practice of ignoring the U.S. Constitution, the law, and minimization procedures by using illegal wiretapping and surveillance by other nefarious means, and that such illegal and unconstitutional conduct is ongoing. As recently as October 24, 2016, "the government orally apprised to Court of significant non-compliance with the NSA's minimization procedures involving questions of data acquired under Section 702 using U.S. person identifiers." The FBI – under the direction of Defendant Comey and in conjunction with each and every Defendant – was found to be a gross offender of the FISA. The Order "chronicles nearly 10 pages listing hundreds of violations of the FBI's privacy-protecting minimization rules that occurred on

---

[2] Julian Hattem, *Attorney: Spy Chief Had 'Forgotten' About NSA Program When he Mislead Congress*, The Hill, May 8, 2015, available at: http://thehill.com/policy/technology/241508-spy-head-had-absolutely-forgotten-about-nsa-program
[3] *Id.*

[Defendant] Comey's watch." "The behavior the FBI admitted to a FISA judge just last month ranged from illegally sharing raw intelligence with unauthorized third parties to accessing intercepted attorney-client privileged communications without proper oversight the bureau promised was in place years ago." Comp. at ¶¶ 23-24 (internal citations omitted). Additionally, confirmed disclosures from various sources, including Circa News further reveal the massive extent of Defendants' illegal and unconstitutional surveillance programs:

> The FBI has illegally shared raw intelligence about Americans with unauthorized third parties and violated other constitutional privacy protections, according to newly declassified government documents that undercut the bureau's public assurances about how carefully it handles warrantless spy data to avoid abuses or leaks….Once-top secret U.S. intelligence community memos reviewed by Circa tell a different story, citing instances of "disregard" for rules, inadequate training and "deficient" oversight and even one case of deliberately sharing spy data with a forbidden party…. The behavior the FBI admitted to a FISA judge just last month ranged from illegally sharing raw intelligence with unauthorized third parties to accessing intercepted attorney-client privileged communications without proper oversight the bureau promised was in place years ago.

The Inspector General of the U.S. Department of Justice declassified a report in 2015 that reveals the internal watchdog had concerns as early as 2012 that the FBI was submitting "deficient" reports indicating it had a clean record complying with spy data gathered on Americans without a warrant. The FBI normally is forbidden from surveilling an American without a warrant. But Section 702 of the Foreign Surveillance Act, last updated by Congress in 2008, allowed the NSA to share with the FBI spy data collected without a warrant that includes the communications of Americans with "foreign targets." But the FISA court watchdogs suggest FBI compliance problems began months after Section 702 was implemented.

Amy Jeffress, the former top security adviser to former Attorney General Eric Holder, was appointed by the intelligence court in 2015 to give an independent assessment of the FBI's record of compliance. Jeffress concluded agents' searches of NSA data now extend far beyond

national security issues and thus were "overstepping" the constitutional protections designed to ensure the bureau isn't violating Americans' 4th Amendment protections against unlawful search and seizure. "The FBI procedures allow for really virtually unrestricted querying of the Section 702 data in a way the NSA and CIA have restrained it through their procedures," she argued before the court in a sealed 2015 proceeding. Comp. at ¶ 25 (internal citations omitted).

As has been the Individual-Capacity Defendants' strategy throughout *Klayman I* and *Klayman II*, and now here, they rely on the fact that they do, in fact, "hold all of the cards," and therefore Plaintiffs and this Court – in their estimation at least – have no choice but to accept that the Individual-Capacity Defendants claims of innocence. While they may have had at least a shred of credibility back when *Klayman I* was filed, they certainly have lost any modicum of credibility now. Not only have they "thumbed their nose" at this Court's preliminary injunction in *Klayman I*, the specific, detailed, and substantiated factual allegations set forth in the Complaint clearly show that the Individual-Capacity Defendants' illegal and unconstitutional surveillance of millions of Americans, including but not limited to Plaintiffs, have brazenly and actually increased in scale. *See* Comp. at ¶¶ 21-27; 63-65. It would be entirely inappropriate legally and equitably, and in fact, non-sensical, for the Individual-Capacity Defendants to now expect this Court and Plaintiffs to merely take their word that Plaintiffs were not unconstitutionally and illegally surveilled, given the Individual-Capacity Defendants and intelligence agencies' longstanding pattern and practice of illegal and unconstitutional behavior, and then repeatedly lying about it to Congress, the courts, and the media.

It is incumbent upon this Court to again stand as the last line of defense against the illegal and unconstitutional surveillance practices of the Individual-Capacity Defendants, something that other courts and members of congressional committees are either afraid or unwilling to do.

Indeed, <u>The Hill</u> only recently disclosed that Defendant Clapper himself "issued revised procedures in 2013 that made it easer for executive branch officials [like Defendant Barack Obama] to 'unmask' the names of lawmakers or congressional staffers caught up in intelligence intercepts overseas. ECF No. 25 Ex. A. The procedures instituted by Defendant Clapper allowed for a lawmaker or staffer to be unmasked merely if "'an executive branch recipient of intelligence' believed that learning 'the identity of the Member of Congress or the Congressional staff is necessary to understand and assess the associated intelligence and further a lawful activity of the recipient agency'…." *Id.* As a result of Defendant Clapper's procedures, the frequency of unmasking Capitol Hill figures has risen exponentially, from just a few per year to as often as once per month, which has "raised concerns in congressional circles." *Id.* "Two 2016 GOP presidential candidates, Sens. Rand Paul (Ky.) and Lindsey Graham (S.C.), have said they believe their identities were unmasked by Obama intelligence officials." *Id.* This explains why members of Congress have done nothing to stop Defendants'' illegal and unconstitutional misconduct — they are all, rightfully, scared of being surveilled, unmasked, and blackmailed or having their personal lives and political careers destroyed by the runaway Individual-Capacity Defendants. This is why it is imperative that this Court, as it has bravely done in the past, again step in to stop the lawless tyranny of the Individual-Capacity Defendants as it is truly the last line of defense against their illegal and unconstitutional misconduct.

## II.   <u>LEGAL STANDARD.</u>

The Individual-Capacity Defendants move to dismiss certain claims under Federal Rules of Civil Procedure ("FRCP") 12(b)(1), 12(b)(5), and 12(b)(6). FRCP 12(b)(5) will be discussed in Section F.

In evaluating a motion to dismiss under either FRCP 12(b)(1) or 12(b)(6), the Court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all

inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979). In any case in federal court, a plaintiff must establish jurisdiction only by a preponderance of the evidence. *See* Fed. R. Civ. P. 12(b)(1); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). When evaluating a motion to dismiss under FRCP 12(b)(1), the court "may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000); *see also Jerome Stevens Pharm., Inc., v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

FRCP 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To defeat a motion to dismiss under Rule 12(b)(6), a claim must contain "enough factual matter (taken as true) to suggest that an agreement was made," explaining that "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading state; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). The *Twombly* Court also explained, more generally, that ". . . a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," yet "must be enough to raise a right to relief above the speculative level" and give the defendant fair notice of what the claim is and the grounds upon which it rests. *Id*. at 555. In other words, Plaintiffs here need only allege "enough facts to state a claim to relief that is plausible on its face" and to "nudge[] the[] claims[] across the line from conceivable to plausible." *Id*. at 570.

Subsequently, in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the U.S. Supreme Court

elaborated. There, the Court held that a pretrial detainee alleging various unconstitutional actions in connection with his confinement failed to plead sufficient facts to state a claim of unlawful discrimination. The Court stated that the claim for relief must be "plausible on its face," *i.e.*, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949. In this regard, determining whether a complaint states a plausible claim for relief is necessarily "a context-specific task." *Id.* at 1950. Therefore, if a complaint alleges enough facts to state a claim for relief that is plausible on its face, such as here, a complaint <u>may not be dismissed</u> for failing to allege additional facts that the plaintiff would need to prevail at trial. *Twombly*, 550 U.S. at 570; *see also Erickson v. Pardus*, 551 U.S. 89, 93 (plaintiff need not allege specific facts, the facts alleged must be accepted as true, and the facts need only give defendant "fair notice of what the *** claim is and the grounds upon which it rests" (quoting *Twombly*, 550 U.S. at 555).

Where the requirements of FRCP 8(a) are satisfied, even "claims lacking merit may be dealt with through summary judgment." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002). In this regard, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. Indeed, "[t]he Federal Rules of Civil Procedure erect a powerful presumption against rejecting pleadings for failure to state a claim." *Cotrell, Ltd. V. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1251 (10th Cir. 1999). Guided by this presumption, the U.S. Court of Appeals for the District of Columbia Circuit has held that the long-standing fundamentals of notice pleading remain intact, and the Court must deny a motion to dismiss for failure to state a claim when the complaint contains "a short plain statement of the claim showing that the pleader is entitled to relief." *Aktieselskabet v. Fame Jeans, Inc.*, 525 F.3d 8, 15, 17 (D.C. Cir. 2008) (quoting Fed. R.

Civ. P. 8(a)(2)) (rejecting that *Twombly* created a heightened pleading standard because "*Twombly* was concerned with the plausibility of an inference of conspiracy, not with the plausibility of a claim").

## III.   THE LAW.

The Individual-Capacity Defendants arrogantly and dismissively assert that Plaintiffs sued for damages because "serial litigation of the 'exact' same allegations wastes this Court's and the parties' time and resources." *See* Individ. Mot. To Dismiss at 1. This is inaccurate and fails to address the harms Plaintiffs inflicted perpetrated by the Individual-Capacity Defendants. Plaintiffs sued Individual-Capacity Defendants James Comey, Michael Rogers, John Brennan, Mike Pompeo, James Clapper, Dan Coats, and former President Barack Obama in their individual capacities because they intentionally corrupted the law and repeatedly violated Plaintiffs' constitutionally protected rights.

The Individual-Capacity Defendants disingenuously argue that Plaintiffs failed to allege standing; a *Bivens* remedy is inappropriate here; the Individual-Capacity Defendants are protected from suit under the doctrine of absolute or qualified immunity; and former President Obama was not properly served. The Individual-Capacity Defendants are mistaken on all counts and their motion to dismiss should be denied because Plaintiffs alleged sufficient standing; *Bivens* relief is available under the circumstances of this case; none of the Individual-Capacity Defendants merit any immunity; and, contrary to the false claims of his counsel in the Obama-friendly Federal Programs Branch, who have been sanctioned before for lying to the Honorable Andrew Hanen on an immigration case involving Defendant Obama's executive action granting amnesty to millions of illegal aliens, *see Texas, et al v. United States of America*, 14-cv-00254,

ECF No. 347 (S.D. Tex 2016), former President Obama has been served properly as shown by a signed and notarized affidavit from a reputable process server. Exhibit A.

A.   **Plaintiffs' Sufficiently Alleged And Pled Standing And The Defendants' Contention Otherwise Is Demonstrably False.**

"Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.' As we have explained, '[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013). "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Id*. at 1147. As the U.S. Supreme Court has held, the "imminence" requirement for future injury is an "elastic concept." *Id*. The Court has found Article III standing where a party merely shows a "reasonable probability that future harm will occur." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010); *see also Davis v. FEC*, 554 U.S. 724, 734 (2008) ("A plaintiff may challenge the prospective operation of a statute that presents a realistic and impending threat of direct injury."). "Moreover, courts have often found probabilistic injuries sufficient to support standing." *Amnesty Int'l USA*, 133 S. Ct. at 1162. Even more, the U.S. Court of Appeals for the District of Columbia Circuit has found standing merely upon just an increased risk of future injury. *See Mountain States Legal found. v. Glickman*, 92 F.3d 1228 (D.C. Cir. 1996).

The Individual-Capacity Defendants disingenuously contend that Plaintiffs do not make plausible allegations that they are or will be the subject of government surveillance. This predictable claim by the ethically bereft Individual-Capacity Defendants (as was true for the Government Defendants) actually underscores why this case must proceed and Plaintiffs to be allowed to take discovery. As has been their pattern and practice in *Klayman I, Klayman II,* and

this instant matter, the Individual-Capacity Defendants again attempt to capitalize on the fact that they "hold all the cards" and that any evidence of wrongdoing is solely in their possession – a convenient and arrogant "Catch 22" where they make the rules and this Court has no business "butting in" and exposing their alleged criminality. From what they view as their position of strength, the Individual-Capacity Defendants simply allege that no wrongdoing has occurred and expect Plaintiffs, this Court, and the American people to trust them and allow them to operate unchecked.

However, as pled in the Complaint, the Individual-Capacity Defendants have completely lost any possible benefit of the doubt, which legally they are not entitled to here in any event, given the substantial evidence weighing against them of their illegal and unconstitutional illegality that has been revealed to the public and continues to be revealed nearly every day. These reports alone make it far more than "plausible" that the Individual-Capacity Defendants are, indeed, illegally surveilling Plaintiffs, and therefore Plaintiffs clearly have standing to bring this action. For instance:

> As recently as October 24, 2016, "the government orally apprised to Court of significant non-compliance with the NSA's minimization procedures involving questions of data acquired under Section 702 using U.S. person identifiers."

> The FBI – under the direction of Defendant Comey and in conjunction with each and every Defendant – was found to be a gross offender of the FISA. The Order "chronicles nearly 10 pages listing hundreds of violations of the FBI's privacy-protecting minimization rules that occurred on [Defendant] Comey's watch." "The behavior the FBI admitted to a FISA judge just last month ranged from illegally sharing raw intelligence with unauthorized third parties to accessing intercepted attorney-client privileged communications without proper oversight the bureau promised was in place years ago."

Compl. at ¶¶ 23-24 (internal citations omitted). Additionally, confirmed disclosures from various sources, including Circa News, further reveal the massive extent of the Individual-Capacity Defendants' illegal and unconstitutional surveillance programs:

The FBI has illegally shared raw intelligence about Americans with unauthorized third parties and violated other constitutional privacy protections, according to newly declassified government documents that undercut the bureau's public assurances about how carefully it handles warrantless spy data to avoid abuses or leaks....Once-top secret U.S. intelligence community memos reviewed by Circa tell a different story, citing instances of "disregard" for rules, inadequate training and "deficient" oversight and even one case of deliberately sharing spy data with a forbidden party.... The behavior the FBI admitted to a FISA judge just last month ranged from illegally sharing raw intelligence with unauthorized third parties to accessing intercepted attorney-client privileged communications without proper oversight the bureau promised was in place years ago.

The Justice Department inspector general's office declassified a report in 2015 that reveals the internal watchdog had concerns as early as 2012 that the FBI was submitting 'deficient" reports indicating it had a clean record complying with spy data gathered on Americans without a warrant. The FBI normally is forbidden from surveilling an American without a warrant. But Section 702 of the Foreign Surveillance Act, last updated by Congress in 2008, allowed the NSA to share with the FBI spy data collected without a warrant that includes the communications of Americans with "foreign targets." But the FISA court watchdogs suggest FBI compliance problems began months after Section 702 was implemented.

Amy Jeffress, the former top security adviser to former Attorney General Eric Holder, was appointed by the intelligence court in 2015 to give an independent assessment of the FBI's record of compliance. Jeffress concluded agents' searches of NSA data now extend far beyond national security issues and thus were "overstepping" the constitutional protections designed to ensure the bureau isn't violating Americans' 4th Amendment protections against unlawful search and seizure. "The FBI procedures allow for really virtually unrestricted querying of the Section 702 data in a way the NSA and CIA have restrained it through their procedures," she argued before the court in a sealed 2015 proceeding.

Compl. at ¶ 25 (internal citations omitted). Thus, at this point, given what has been disclosed to

the public – and what continues to be disclosed nearly every day – it is impossible for the

Individual-Capacity Defendants to credibly assert that they have not engaged in a continued

pattern and practice of conscious and willful disregard for constitutional and other rights of

millions of Americans, including Plaintiffs. The Individual-Capacity Defendants, whose claims

of honesty have been shredded, therefore revert to their deceitful "strategy" of simply claiming

that Plaintiffs have not alleged that they have been personally surveilled. However, this fails as

well.

Both Plaintiff Montgomery and Plaintiff Klayman "fall squarely within the locus of those targeted by Defendants, since Plaintiff Montgomery is a whistleblower and Plaintiff Klayman the attorney who represents him." Compl. at ¶ 30. Plaintiff Montgomery is a "former NSA, CIA, and DNI contractor and whistleblower regarding Defendants' longstanding pattern and practice of conducting illegal, unconstitutional surveillance on millions of Americas, which continues to this day." Compl. at ¶ 33. Plaintiff Klayman has "brought many lawsuits that have attracted national attention, including one against the NSA and others, among other defendants, for illegally and unconstitutionally spying on millions of Americans." Compl. at ¶ 53. Furthermore, Plaintiff Klayman "has been publicly trying to raise awareness of, and demand an investigation into, Defendants' ongoing illegal and unconstitutional surveillance of millions of Americans, as well as to prosecute wrongdoers" and even "met with House Intelligence Committee, the Senate Intelligence Committee, the House Judiciary Committee and the Senate Judiciary Committee and its members an staff with regard to the illegal and unconstitutional spying and surveillance at issue." Compl. at ¶ 54-55. Thus, given the fact that both Plaintiffs are playing a pivotal role in exposing and seeking redress to prevent continuing massive, illegal and unconstitutional scheme to perform warrantless surveillance on millions of Americans, it is far more than simply "plausible" that they are personally the targets of this scheme – it is certain, given Plaintiffs experiences of late, as detailed in the Complaint and supporting documentation and affidavits.

As set forth in great detail in the Complaint, Plaintiffs have personally experienced verifiable tell-tale signs of the Individual-Capacity Defendants' illegal and unconstitutional surveillance, despite their disingenuous and predictable attempts to falsely marginalize them. Plaintiff Klayman, almost immediately after corresponding with Representative Devin Nunes,

Chairman of the House Intelligence Committee, experienced several abnormalities with his mobile phone, including but not limited to (1) fake "software updates" which Verizon confirmed to Plaintiff Klayman were not initiated on its end; (2) battery draining at an exponential rate; (3) files erasing and downloading automatically without Plaintiff Klayman's consent; and (4) numerous other abnormalities. Compl. at ¶ 57-62. The Individual-Capacity Defendants attempt to explain away these events as simple phone malfunctions (which is improper at the motion to dismiss stage) and as "fanciful allegations", *see* Indiv. Mot. To Dismiss at 5, yet the timing of these abnormalities and the fact that these issues have persisted to the point where Plaintiff Klayman has had to visit three different Verizon stores and even have his phones switched out at the encouragement of the Verizon employees cannot be explained away so easily. Indeed, the probability that Plaintiff Klayman would experience the same issues after proactively changing phones by pure happenstance are slim to none. Even Plaintiff Montgomery, an expert on the subject, "confirmed that battery drainage is a tell-tale sign that the Defendants have successfully hacked into a cellular phone and that Defendants often insert malware onto recipients' phones using fake 'software updates.'" Compl. at ¶ 60. Plaintiff Montgomery detailed in the Complaint numerous instances of hacking attempts by the Individual-Capacity Defendants, which upon tracing the IP addresses of the origination points, confirmed to have originated from the FBI, Department of Defense and the CIA. Compl. at ¶ 44-47.

Given the specific instances of illegal and unconstitutional surveillance personally experienced by Plaintiffs as detailed above, the Individual-Capacity Defendants' meritless claim that Plaintiffs do not plausibly plead that they were surveilled must fail. Particularly at this stage of the case, Plaintiffs have far exceeded the threshold to establish standing to challenge the Individual-Capacity Defendants' surveillance on them and as such, they must be allowed to

proceed to discovery, a preliminary injunction hearing, and trial.

**B.      The Allegations In The Complaint Support A *Bivens* Claim.**

The Individual-Capacity Defendants essentially argue that there can be no *Bivens* relief when government officials, sued in their individual capacity, violate the Fourth Amendment to the U.S. Constitution by unreasonably searching and seizing Plaintiffs' phone and other records without suspicion or probable cause. Fortunately, the U.S. Supreme Court acknowledged a remedy for egregious, unconstitutional behavior by federal officers. *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 392-95 (1971). Courts apply a two-step process when determining whether *Bivens* applies. First, a court examines whether there are any existing, alternative processes for protecting the constitutional interest at issue. *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). Second, even if the court finds no equally effective alternative process it then determines whether there are any special factors that counsel for the hesitation of creating a *Bivens* remedy. *Id.*

Here, the Individual-Capacity Defendants argue that the FISA, the Wiretap Act, and the Stored Communications Act each provide a way to immunize them from a *Bivens* action. Next, and not surprisingly, they still argue that "special factors," including matters of national security, intelligence-gathering, and classified information would be implicated if this Court allowed Plaintiffs' *Bivens* action to proceed. The Individual-Capacity Defendants' arguments fail because illegal and intentional government overreach is precisely the type of conduct for which *Bivens* provides a remedy. The FISA, the Wiretap Act, and the Stored Communications Act do not preclude a *Bivens* action and the "special factors" cited as grounds for *Bivens* immunity simply do not apply here and are yet another attempt to skate past liability in order to continue to violate Plaintiffs' and others' constitutional rights.

*Bivens* actions were designed to prevent government officials from abusing their power or employing their power as an instrument of oppression. *Brown v. Nationsbank Corp.*, 188 F.3d 579, 591 (5th Cir. 1999). The constant under our U.S. Constitution is that "[n]o man in this country is so high that he is above the law. All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it." *United States. v. Lee*, 106 U.S. 196, 220 (1882). In the U.S. Constitution, "We the People" showed this world a new way to govern and created a "system of jurisprudence [that] rests on the assumption that all individuals, whatever their position in government, are subject to federal law." *Butz v. Economou*, 438 U.S. 478, 506 (1978). *Bivens* provides a remedy when federal officials violate citizens' constitutional rights by allowing such citizens to recover damages from those officials in their individual capacities.[4] *Id.* at 590.

In *Bivens*, the U.S. Supreme Court held that a plaintiff could recover money damages for violations of the Fourth Amendment committed by federal agents. *Bivens*, 403 U.S. at 397; *see also Bagola v. Kindt*, 131 F.3d 632, 637 (7th Cir. 1997). Courts have also recognized that a *Bivens* remedy extends beyond Fourth Amendment violations and encompasses other constitutional rights. *Butz*, 438 U.S. at 478.

Executive branches of abuse of power that: (1) shock the conscience; (2) violate the decencies of civilized conduct; or (3) interfere with rights implicit in the concept of ordered liberty have long been subject to judicial review, check and correction. *Rochin v. California*, 342

---

[4] "Where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." *Bivens*, 403 U.S. at 392, 395; *see also Davis v. Passman*, 442 U.S. 228, 245, 246-47 (1979) (personal liability for violations of the Fifth Amendment's Equal Protection Clause because plaintiff's constitutional rights were violated and she had no effective means to enforce those rights other than *Bivens*).

U.S. 165, 169-70 (1952) (government officials who act with deliberate indifference to constitutional rights "shock[] the conscience," act arbitrarily and capriciously).

Here, Plaintiffs pled violations of the Fourth and First Amendments to the U.S. Constitution. The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The First Amendment states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. The U.S. Supreme Court has long recognized that government investigative activities, including communications surveillance, endanger these freedoms. *See, e.g.*, *NAACP cv. Ala. Ex rel. Patterson*, 357 U.S. 449, 466 (1958). This was the basis for the Court's landmark ruling in *NAACP v. Alabama*, which struck down a state order for the NAACP to disclose its membership lists. *Id.* As the Court explained: "This Court has recognized the vital relationship between freedom to associate and privacy in one's associations . . . Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *Id.* at 462; *see also United States v. Jones*, 132 S. Ct. 945, 956 (2012) ("Awareness that the government may be watching chills associational and expressive freedoms.").

Here, the alleged violations of the Fourth Amendment – illegal and unconstitutional surveillance of Plaintiffs – does not stray from the original claims recognized by *Bivens*. Despite

the Individual-Capacity Defendants' disingenuous attempts to minimize *Bivens* as only involving "handcuffing a man in his own home without a warrant," Individ. Mot. to Dismiss at 9, the actual conduct contemplated by the Court is much broader. As the U.S. Supreme Court recognized, a large part of the violation in *Bivens* was the fact that the federal agents "searched the apartment from stem to stern." *Bivens*, 403 U.S. at 389. This is the exact same type of allegation set forth by Plaintiffs – illegal search and seizure of Plaintiffs' computer data, phone data, and other forms of electronic data. The only actual difference is that federal agents need not physically enter into Plaintiff's homes to conduct their illegal search and seizure. Of course, the technology that enables the Individual-Capacity Defendants to perform this illegal surveillance, search, and seizure was not even a remote possibility in 1971, when *Bivens* was authored and the illegal conduct at issue here is even more invasive than in *Bivens*. This does not change the fact, however, that the underlying violation is essentially the same. Only the tools employed to conduct the illegal search and seizures have evolved, as this Court recognized in *Klayman I*.

### 1.     *Alternative Process Cannot Remedy Plaintiffs' Inflictions*

The Individual-Capacity Defendants intentionally miss the mark in alleging that Plaintiffs' *Bivens* claims are precluded by FISA, the Wiretap Act, and the Stored Communications Act ("SCA"). Essentially, the Individual-Capacity Defendants argue – falsely – that Plaintiffs have "alternative methods of relief" because Congress, in passing the FISA, the Wiretap Act, and the SCA have implemented schemes to regulate the surveillance of individuals such as Plaintiffs. To the extent that the Individual-Capacity Defendants allege that the mere fact that Congress intended to regulate surveillance precludes *Bivens* claims, such an outlandish assertion must be rejected. The allegations set forth in the Complaint center around the Individual-Capacity Defendants' willful disregard of the law and the U.S. Constitution and their

illegal and unconstitutional surveillance of Plaintiffs. The limitations that Congress perhaps intended for the Individual-Capacity Defendants to abide by are entirely irrelevant, as they have clearly demonstrated that they have no regard – if not disdain for – the law.

The Individual-Capacity Defendants also argue that the FISA, Wiretap Act and the SCA already provide private rights of action, which, in turn preclude *Bivens* actions. The only case law that the Individual-Capacity Defendants rely upon in this regard is *Kelley v. FBI*, 67 F. Supp. 3d 240 (D.D.C. 2014), which only states that the SCA precludes a *Bivens* action. Importantly, nothing in *Kelly* states that either FISA or the Wiretap Act preclude a *Bivens* action. The SCA, as discussed in *Kelly* provides relief for an extremely narrow scope of activity, which does not even begin to cover the misconduct alleged in Plaintiffs' Complaint. The SCA only precludes a *Bivens* claim to the extent that the "individual defendants unlawfully searched and seized their email." *Id.* at 270. Thus, the SCA does not provide an "alternative remedy" to the extent that Plaintiffs alleged that the Individual-Capacity Defendants did anything other than searching and seizing email, such as hacking and stealing data from Plaintiffs' phones and computers and other illegal and unconstitutional conduct alleged in the Complaint.

The Individual-Capacity Defendants further allege that the possibility of injunctive relief "also weighs heavily against a judicially-created damages remedy."[5] Individ. Mot. To Dismiss. at 15. In support, the Individual-Capacity Defendant contend that *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) precludes *Bivens* claims where the challenged conduct is a "large-scale policy decision…." *Id.* at 1862. However, this assertion misses the point. Plaintiffs here set forth Defendants' massive scheme to conduct illegal and unconstitutional surveillance on millions of Americans as mere background to Plaintiffs' individual claims that they themselves were subject

---

[5] It is an outrage and scandalous that hard earned taxpayer monies are being misused by "Deep State" defense lawyers for the U.S. Department of Justice – Plaintiff Klayman's once proud alma mater – to defend the Individual-Capacity Defendants and subvert the U.S. Constitution.

to this illegal and unconstitutional surveillance. The *Abbasi* Court held that a central reason why *Bivens* was precluded was that they "do not challenge individual instances of discrimination or law enforcement overreach…." *Id*. at 1862. The opposite is true here, where Plaintiffs have pled specific instances, pertaining only to themselves and not the public at large, of Defendants' illegal and unconstitutional surveillance that form the basis of the *Bivens* claim. Tellingly, *Abbasi* was filed "on behalf of a putative class," *id* at 1853, whereas the claims here are not. Lastly, in the unlikely event that this Court should find that Plaintiffs' *Bivens* claims should be precluded (they are not), Plaintiffs respectfully request leave to amend to pursue claims under the appropriate statutes.

> **2.** *No Viable "Special Factors" Exist to Warrant the Exclusion of a Bivens Remedy*

The Individual-Capacity Defendants predictably raise false "national security concerns" and "classified information" as special factors that precludes a *Bivens* claim. As Plaintiffs have suggested in the past, and continue to do now, any of Defendants' manufactured "concerns" over classified information can be easily remedied by the fact that this Court has the requisite security clearance to view such material, and this Court can easily fashion a discovery and trial plan that prevents the public disclosure of any actual classified material, to the extent that any would actually be implicated in this litigation, by, for instance, reviewing such materials *in camera* and ordering that certain documents be filed under seal.

Furthermore, it is disingenuous at best for the Individual-Capacity Defendants to attempt to assert that this case, which only seeks redress for the illegal and unconstitutional surveillance of two American citizens, would actually implicate matters of national security. Indeed, as this Court has recognized in the past, it is abundantly clear that even now, at this moment, the Individual-Capacity Defendants and their counsel know full well whether Plaintiffs have been

the subject of the illegal and unconstitutional surveillance alleged in the Complaint. A deep-dive into the government's "scope and operational details of the government's foreign intelligence surveillance activities," Individ. Mot. To Dismiss. at 18, is entirely unnecessary in the context of this case. All that matters is whether Plaintiffs have been surveilled. As is their shop-worn modus operandi, the Individual-Capacity Defendants' disingenuous attempt to muddle the issues by asserting deep national security concerns is nothing more than a transparent attempt to create a "red-herring." This assertion must therefore be summarily rejected.

Lastly, the Individual-Capacity Defendants argue that attempting to litigate these issues "would call into question the formulation and implementation of a general policy." Individ. Mot. To Dismiss. at 20. This is patently false. Nothing pled in Plaintiffs' Complaint could possibly result in "altering an entity's policy." *Id.* Indeed, the crux of Plaintiffs' Complaint is simple – the Individual-Capacity Defendants, who falsely believe that they are above the law, must be made by this Court to to simply obey the law, as written and enacted, and not engage in <u>illegal</u> and <u>unconstitutional</u> surveillance. If this simple request requires an alteration of an entity's policy, then the Defendants are essentially admitting that their actual, expressly stated policy and practice is to completely disregard the U.S. Constitution and the law. If this is truly the case, then it is more important than ever that this Court allow this matter to proceed simply in the interest of maintaining the remnants of the rule of law. What Plaintiffs pled, and what this Court must accept at this stage of litigation is that the illegal and unconstitutional conduct is perpetrated by "individual federal employees" – the Individual-Capacity Defendants. The mere fact that the illegal and unconstitutional conduct of these Defendants happen to touch millions of Americans does not render it policy promulgated and pursued by the executive branch. All this indicates is

that the Individual-Capacity Defendants wield a significant amount of dangerous power and authority.

### C.   The Individual-Capacity Defendants Are Not Entitled To Qualified Immunity Because When They Violated Plaintiffs' Rights, They Acted Outside Their Discretion as Federal Officers.

Federal officers, like the Individual-Capacity Defendants here, cannot have discretion to violate criminal or civil statutes or the U.S. Constitution. "[I]n a suit for damages arising from unconstitutional action, federal executive officials *exercising discretion* were entitled only to qualified immunity . . ." *Butz v. Economou*, 438 U.S. 478, 508 (1977) (emphasis added). If a government official, sued in his or her personal capacity, allegedly commits a tort or a crime outside the discretion of his or her government job function, then that official is not entitled to immunity, qualified or otherwise. Fundamentally, Plaintiffs Complaint, which must be taken as true, alleges that the Individual-Capacity Defendants acted outside the scope of their discretion and employment. Compl. at ¶ 19.

The commission of an intentional tort by a federal officer is necessarily outside the scope of his or her employment. *See Arnold v. United States*, 816 F.2d 1306 (9th Cir. 1987) (sexual harassment); *McKinney v. Whitfield*, 736 F.2d 766 (D.C. Cir. 1984) (assault and battery). The commission of an intentional tort that is unrelated to a federal official's duties is beyond even the outer perimeter of the scope of employment. *Wilson v. Cagle*, 711 F. Supp. 1521, 1532 (N.D. Cal. 1988). If there are laws and regulations that prohibit the misconduct at issue in the civil action, then – by definition – the misconduct cannot qualify as discretionary. Or as stated by the U.S. Supreme Court, a federal employee's actions are not discretionary "if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536

(1988)). *See also Medina v. United States*, 259 F.3d 220, 225 (4th Cir. 2001) ("[f]ederal officials do not possess discretion to violate constitutional rights or federal statutes."); *Perkins v. United States*, 55 F.3d 910. 914 (4th Cir. 1995) ("Obviously, failure to perform a mandatory function is not a discretionary function"); *Baum v. United States*, 986 F.2d 716, 720 (4th Cir. 1993) (if federal "statute, regulation or policy applies, then the conduct involves no legitimate element of judgment or choice . . . if the plaintiff can show that the actor in fact failed to so adhere to a mandatory standard then the claim does not fall within the discretionary function exception").

Importantly, in *Trulock v. Freeh*, 275 F.3d 391 (4th Cir. 2001), a landmark case that undersigned counsel filed and argued before the U.S. Court of Appeals for the Fourth Circuit, plaintiffs, an ex-intelligence official and his assistant, sought review of an order of the U.S. District Court for the Eastern District of Virginia, which dismissed their action against defendants, FBI Director Louis Freeh, his agents, and his supervisors, alleging an unconstitutional seizure and search of their home and computer in retaliation for the official's published criticism of the FBI. *Id*. at 397-98. The U.S. Court of Appeals for the Fourth Circuit held that plaintiffs First Amendment claim could proceed and that the officials, including FBI Director Freeh, were not entitled to qualified immunity because "a public official may not misuse his power to retaliate against an individual for the exercise of a valid constitutional right. *Id*. at 405. Additionally, the court ordered the case to proceed to discovery. *Id*. Thus, like former FBI Director Freeh, Individual-Capacity Defendant Comey is not immune from suit for his violations of Fourth and First Amendment rights and neither are the other Individual-Capacity Defendants.

In *McKinney v. Whitfield*, an employee brought an action against a manager for assault and battery. *McKinney*, 736 F.2d at 767-68. Originally, the U.S. District Court for the District of

Columbia dismissed the action under FRCP 12(b)(6) because the act in question fell within the zone of his discretionary authority because it occurred in the context of a supervisor-employee dispute about a proposed personnel action, the temporary lay-off of the employee. *Id*. at 768. Upon appeal, however, the U.S. Court of Appeals for the District of Columbia Circuit reversed, ruling that the manager's general engagement in supervision within the scope of his authority did not cloak with immunity the specific conduct at issue; namely, assaulting someone. The court ruled that the manager exceeded the outer perimeters of his responsibilities and acted beyond his line of duty. *Id*. at 771-72. Therefore, immunity was denied. As the nameplate on President Truman's Whitehouse desk read: "The Buck Stops Here."

Here, just as the defendant in *Whitfield*, the Individual-Capacity Defendants cannot be cloaked with immunity for violating Plaintiffs' constitutional rights by illegally and intentionally searching and seizing Plaintiffs' phone and other records, including Internet communications and social media without just cause. This type of engagement is not within the scope of their employment as federal officials and thus they are not entitled to qualified immunity.

*Holloman v. Harland* is particularly elucidating and on point. There, a student claimed that his rights were violated when his teacher and principal punished him for silently raising his fist during the daily Pledge of Allegiance. He further claimed that his rights were violated by the teacher's daily ritual of conducting a silent moment of prayer. *Holloman v. Harland*, 370 F.3d 1252, 1259-60 (11th Cir. 2004).

Importantly, in 1995, the Alabama state legislature enacted a statute which *required* the State Board of Education and all local school boards to:

> Develop and implement . . . a comprehensive character education program for all grades to consist of **not less than ten minutes of instruction per day** focusing upon the students' development of the following character traits: courage, **patriotism**, citizenship, honesty, fairness, respect for others, kindness,

cooperation, self-respect, self-control, courtesy, **compassion**, **tolerance**, diligence, **generosity**, punctuality, cleanliness, cheerfulness, school pride, respect for the environment, patience, creativity, sportsmanship, loyalty, and perseverance. Each plan of instruction **shall include the Pledge of Allegiance to the American flag**.

Ala. Code § 16-6B-2(h); *Id*. at 1261-62 (emphasis added). This law made daily recitation of the Pledge of Allegiance a part of the character education program the legislature required local school boards and teachers – government employees – to implement to their students. The Alabama legislature provided one caveat for the students, however, and not the school board or teachers: "The State Board of Education shall afford all students attending public kindergarten, primary and secondary schools the opportunity each school day to voluntarily recite the pledge of allegiance to the United States flag." Ala. Code § 16-43; *id*. at 1263.

At first glance, the U.S. District Court for the Northern District of Alabama mistakenly granted summary judgment (well past the motion to dismiss stage) on both claims as to the teacher and principal on qualified immunity grounds. But the U.S. Court of Appeals for the Eleventh Circuit disagreed and reversed. It analyzed the discretionary function issue, focused on whether the acts or in-acts in question involved exercise of actual discretion, whether the acts or in-acts fell within the employee's job responsibilities, and held that the inquiry regarding whether an official is acting within the scope of his or her employment is two-fold: the court asks "whether the government employee was (a) performing a legitimate job-related function (that is, a job-related goal), (b) through means that were within his [or her] power to utilize." *Id*. at 1265. It ruled that:

> Each government employee is given only a certain 'arsenal' of powers with which to accomplish her goals. For example, it is not within a teacher's official powers to sign her students up for the Army to promote patriotism or civic virtue, or to compel them to bring their property to school to redistribute their wealth to the poor so that they can have firsthand experience with altruism. Employment by a local, county, state, or federal government is not a carte blanche invitation to push the envelope and tackle matters far beyond one's job description or achieve one's

> official goals through unauthorized means. Pursuing a job-related goal through means that fall outside the range of discretion that comes with an employee's job is not protected by qualified immunity.

*Id.* at 1267. While the U.S. Court of Appeals for the Eleventh Circuit held that the teacher in question "attempt[ed] to pursue the legitimate job-related function of fostering her students' character by teaching compassion[,]" the teacher failed the "discretionary function" test because she was not pursuing this job-related goal through legitimate means that fell within her powers. The court ruled, "[w]hile fostering character development and moral education were undoubtedly part of [the teacher's] official responsibilities, this does not automatically empower her to do anything within her judgment that furthers those goals." *Id.* at 1283.

There, in *Holloway*, the court found that the teacher acted outside her legitimate job-related function by silently taking a small amount of time for prayer, even though the state legislature required all educators to develop and implement a comprehensive character education program, which instructs students to be courteous, patriotic, honest, fair, kind, compassionate, tolerant, generous, respectful, patient, and loyal. *See* Ala. Code § 16-6B-2(h). Many people in the educator's position may believe that because she was instructed to educate the children on character, and many of the mandatory subjects to be taught are directly related to "The Golden Rule" – that is, do unto others as you would have them do unto you, a Biblical concept – a moment for silence for personal prayer and reflection would be entirely consistent with the state legislature's rule. But, the court still ruled that she was not within her discretion when she tried to follow the Alabama Code.

As for the requirement that the Pledge of Allegiance is recited daily, and because of the character program which is to teach patriotism and respect for others, reasonable people may believe that when she punished the student for not reciting the Pledge of Allegiance, she was acting within her job-related functions to teach the student patriotism. But, still, the court ruled

that she was not within her discretion when she punished the student for not reciting it. Where educators and courts can disagree whether the teacher acted within her discretion as a teacher when she held a silent moment of prayer and punished a student for not reciting the Pledge of Allegiance, no educator, court or person can consider the Individual-Capacity Defendants' illegal spying in violation of the First and Fourth Amendments to the U.S. Constitution to be anywhere near part of their discretion as federal officials.

The U.S. Supreme Court has long held that when a U.S. official acts outside a grant of discretionary authority, "there will be no shelter from liability because there is no room for choice and the action will be contrary to policy." *United States v. Gaubert*, 499 U.S. 315, 324 (1991). As this court explains, "[a] government official has no discretion to violate the binding laws, regulations, or policies that define the extent of his official powers." *Loumiet v. United States*, 968 F. Supp. 2d 142, 158 (D.D.C. 2013). As such, the Individual-Capacity Defendants are not entitled to qualified immunity because when they violated Plaintiffs' constitutional rights, they not only violated the law but also did so by manipulating and far exceeding the scope of their official powers.

> **D.     In the Unlikely Event This Court Concludes That the Individual-Capacity Defendants Acted Within Their Discretion as Federal Officers When They Violated Plaintiffs' Rights, the Individual-Capacity Defendants Are Still Not Entitled to Qualified Immunity Because Plaintiffs' Stated Valid Claims That the Individual-Capacity Defendants Violated and Those Violated Rights Were Clearly Established.**

Even if the official acted within his or her discretionary functions, qualified immunity does not shield "the plainly incompetent or those who knowingly violate the law."[6] *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Qualified immunity protects public officials from personal

---

[6] If a federal employee commits a tort in his or her personal capacity, then he or she is responsible individually and subject to personal liability. Gregory C. Sisk, Litigation With the Federal Government (ALI-ABA, 4th Ed. 2006) at § 5.06, at 359.

liability only if the alleged misconduct did not violate clearly established statutory or constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). It is similar to a good faith defense, but focuses on objective reasonableness, not subject belief. *Id*. at 818. It balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To determine whether qualified immunity applies, the court looks to (1) whether a plaintiff's allegations, taken as true, show that the official's conduct violated a constitutional or statutory right, and (2) whether that right was "clearly established" at the time of the defendant's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). While the Saucier Court held that lower courts must decided qualified immunity defenses using that two step analysis in that sequence, in *Pearson v. Callahan*, the U.S. Supreme Court relaxed the analysis, holding that the Saucier procedure was not mandatory and that courts should have the flexibility to decide the question in either order. The Court observed that it is sometimes easier to determine whether a constitutional right was clearly established than whether there is such a right. *Pearson*, 555 U.S. at 235; *see also Thomas v. Shinseki*, 657 F. Supp. 2d 74, 76 (2009) ("Courts have discretion to address either of these questions first.").

1.   ***Plaintiffs' Allegations Are Sufficient to Overcome Any Alleged Qualified Immunity Because Plaintiffs' Have Stated Valid Claims for the Individual-Capacity Defendants' Various Violations.***

"Facial plausibility" does not equate to facial "probability." *Iqbal*, 556 U.S. at 678. Dismissal is only "proper when, taking the material allegations of the complaint as admitted . . . and construing them in plaintiffs favor . . . the court finds that the plaintiffs have failed to allege all the material elements of their cause of action." *Taylor v. FDIC*, 132 F.3d 753, 761 (D.C. Cir. 1997).

Plaintiffs pled with the requisite specificity that the Individual-Capacity Defendants (1) unreasonably searched and seized Plaintiffs' phone and other records, violating the Fourth Amendment by not describing with particularity the place to be searched or the person or things to be seized; Compl. at ¶¶ 69-70; (2) the Individual-Capacity Defendants have continued to violate the minimization procedures mandated by Section 702 of FISA and have continued to illegally and unconstitutionally spy on Plaintiffs and others; Compl. at ¶ 71; (3) the Individual-Capacity Defendants abridged and violated Plaintiffs' First Amendment rights of freedom of speech and association by significantly minimizing and chilling Plaintiffs' freedom of expression and association; Compl. at ¶ 75; (4) Plaintiffs are fearful of contacting persons and entities via cell phone, Internet, and social media out of fear of the misuse of government power and retaliation against these persons and entitles who challenge the misuse of government power; Compl. at ¶ 77; (5) Plaintiff Montgomery was induced to turn over 47 hard drives with a value in excess of $50,000 which he has not received back and that the hard drives at issue were the property of Plaintiff Montgomery; Compl. at ¶¶ 98-99; (6) Individual-Capacity Defendant Comey falsely represented to Plaintiff Montgomery that the FBI would conduct an investigation into the evidence of illegal, unconstitutional surveillance contained on Plaintiff Montgomery's hard drives and that this material representation was made with knowledge of its falsity and with an intent to deceive Plaintiff Montgomery; Compl. at ¶ 110-112; (7) Plaintiff Montgomery relied on this material representation; Compl. at ¶ 113; and (8) Plaintiffs have been injured as a direct and proximate result of the intentional and willful actions of the Individual-Capacity Defendants. Compl. at ¶¶ 72, 79, 88, 114, 120.

At this pleading stage of the case in particular, the Individual-Capacity Defendants cannot claim qualified immunity by simply summarily denying Plaintiffs' factual allegations and

inserting their own version of what they believed occurred. *See Crawford v. Britton*, 523 U.S. 574, 598 (1998) (to "resolve [a] threshold question" of qualified immunity, the court "assum[es] the truth of the plaintiff's allegations"). If the Individual-Capacity Defendants wish to contest the strength of Plaintiffs' allegations, those arguments must come after discovery in a summary judgment motion. Dismissal on a FRCP 12(b)(6) motion at this stage is inappropriate. *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987) ("[I]f the actions [the defendant] claims he took are different from those the [plaintiffs] allege (and are actions that a reasonable officer [or official] could have believed lawful), then discovery may be necessary before motion for summary judgment on qualified immunity grounds can be resolved.").

> **2.** ***Plaintiffs' Allegations Are Sufficient to Show That the Individual-Capacity Defendants Violated Plaintiffs' Clearly Established Rights.***

The constitutional rights that the Individual-Capacity Defendants intentionally and recklessly trampled on as a matter of course were more than clearly established at the time they violated Plaintiffs' rights. The Individual-Capacity Defendants' illegality violates clearly established law "when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he [or she] is doing violates that right . . ." *Ashcroft*, 563 U.S. 731 at 733 (citing *Anderson*, 483 U.S. 635 at 640). In defining what "clearly established" means, the U.S. Supreme Court ruled that the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201.

> **a.** Plaintiffs' Rights Were Sufficiently Clear When the Individual-Capacity Defendants Violated Them.

In *Harlow*, the U.S. Supreme Court ruled that "[w]here an official could be expected to know that certain conduct would violate statutory or constitutional rights, he [or she] should be

made to hesitate." *Harlow*, 457 U.S. at 819. In evaluating this standard, a violation in accordance with pre-existing law or a case directly on point is not necessary; only that the official knew that the rights he or she was violating were clear in that person's mind and experience. Indeed, the law in some circuits *used* to be that a government actor could be denied qualified immunity only for acts that are "so obviously wrong, *in light of pre-existing law*, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing." *Lassiter v. Alabama A. & M. Univ.*, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (emphasis added). But, the U.S. Supreme Court specifically citing *Lassiter* (along with a handful of other cases), held that "this rigid gloss in the qualified immunity standard . . . is not consistent with [the Supreme Court's] cases." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). There need not be a case "on all fours" with identical facts. "Officials can still be on notice that their conduct violates established law even in novel factual circumstances. *Id*. at 741. Even "general statements of law are not inherently incapable of giving fair and clear warning [to the official] . . ." *Id*.

In *Hope*, a prisoner was tied to a hitching post and left in the sun. The U.S. Court of Appeals for the Eleventh Circuit found that this was cruel and unusual punishment, but that the officers were protected by qualified immunity because there was no case directly on point holding that such particular behavior violated a statutory or constitutional right. The U.S. Supreme Court reversed, ruling that a case on point is sufficient, but not necessary. *Hope*, 536 U.S. at 755.

In *Guerrero v. Moore*, a police sergeant appealed the district court's denial of his motion for summary judgment on the basis of qualified immunity when the lower court found that he violated plaintiff's Fourth Amendment right even though when he entered the person's home, he did so to serve a judicially-issued misdemeanor summons. *Guerrero v. Moore*, 442 Fed. Appx.

57, 58 (4th Cir. Va. 2011). The U.S. Court of Appeals for the Fourth Circuit affirmed, ruling "[w]e find that the right at issue [entering a home without a warrant but with a summons] was clearly established at the time of the incident." *Id.* at 59; *see also Espinosa v. City & County of San Francisco*, 598 F.3d 528 (9th Cir. 2010) (Officers entered an apartment where the decedent was staying and searched it. They found a bloody shirt and detained one person. They found the decedent in the attic and when he did not follow orders to put his hands up, the officers fatally shot him. The U.S. Court of Appeals for the Ninth Circuit affirmed the lower court's decision in denying summary judgment in favor of defendant officers, because "fact issues remained concerning whether the officers violated the Fourth Amendment.").

The Fourth Amendment clearly establishes the right to be free from unreasonable searches and seizures. The First Amendment establishes freedom to associate and freedom of speech. The law does not get more clearly established than that.

> b.   A Reasonable Official in the Individual-Capacity Defendants' Position Would Have Understood That Their Misconduct Violated That Right.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his [or her] conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 195 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). The principles of qualified immunity shield an officer when that person reasonably believes that his conduct complies with the law. *Pearson*, 555 U.S. at 244 (emphasis added). The essential inquiry is: would an objectively reasonable official have known that his conduct was unlawful? *See Anderson*, 483 U.S. at 640.

As discussed, in *Hope*, with regard to whether there needs to be a case factually on point in order for qualified immunity to be pierced, the U.S. Supreme Court reversed the lower court's

decision, stating that a case on point is not necessary. *Hope*, 536 U.S. at 755. With regard to reasonableness, the U.S. Supreme Court ruled that a reasonable person would have known that handcuffing a prisoner to a hitching post is a violation of a clearly established right and in violation of the Eighth Amendment. *Id*. at 742.

Just as a reasonable person would have known that it is a violation of a prisoner's rights to handcuff him to a hitching post, so too is it unreasonable to intentionally spy on, seize, and convert Plaintiffs' communications and property, particularly after this Court's widely publicized rulings in *Klayman I* and *Klayman II*.

### E.     Former President Obama Is Not Entitled To Absolute Immunity Because The Damages Plaintiffs Suffered Were Not Predicated On His Official Acts.

The Individual-Capacity Defendants are of course correct that the office of the president is singularly important, which is why he enjoys absolute immunity for his official – not illegal or unconstitutional – acts. *See Nixon v. Fitzgerald*, 457 U.S. 731 (1982). But this case involves his alleged criminality, not just while in office but in *unofficial* conduct in which he engaged in and continues to engage in *after leaving office*, and it is beyond dispute that Individual-Capacity Defendant Obama enjoys no immunity at all – not even qualified immunity – for his unofficial private conduct. *See Clinton v. Jones*, 520 U.S. 681, 692-94 (1997) ("[W]e have never suggested that the President, or any other official, has an immunity that extends beyond the scope of any action taken in an official capacity."); *id*; at 696 (reaffirming that the President is "subject to the laws for his purely private acts"); *see also Halperin v. Kissinger*, 606 F.2d 1192, 1210-11 (D.C. Cir. 1979), denying former President Nixon absolute immunity in a *Bivens* action for illegally wiretapping the plaintiff's telephone:

> In order to accept defendant Nixon's argument that he, as a former President, is absolutely immune from this suit, we would have to hold that his status as President sets him apart from the other high Executive officials named as

defendants to this action. Such a distinction would have to rest on a determination either that the Constitution impliedly exempts the President from all liability in cases like this [Fourth Amendment violation] or that the repercussions of finding liability would be drastically adverse. Because we are unable to make that distinction, we do not believe that he is entitled to absolute immunity to a damage action by a citizen subject ted to an unconstitutional or illegal wiretap.

*Id.*

Here, Plaintiffs pled that "Defendants Obama, Brennan, Clapper, Rogers, and Coats *have continued to engage in* ongoing, unlawful, and unconstitutional mass surveillance." Compl. at p. 4, ¶ 52 (emphasis added). This continuation of illegal conduct occurred – through those he left in charge – after former President Obama left office; the so-called "Obama Deep State." Just as in *Halperin*, where the U.S. District Court for the District of Columbia denied former President Nixon absolute immunity on an alleged Fourth Amendment violations, so too should this Court deny former President Obama absolute immunity for violating Plaintiffs' Fourth and First Amendment rights.

### F. Plaintiffs Properly Served Former President Obama.

Attached hereto as <u>Exhibit A</u> is the affidavit of service for Defendant Obama in this matter. As shown in the affidavit, Defendant Obama was served on July 12, 2017 at 12:37 PM, both individually and in his past official capacity as President of the United States of America at 1250 24th St., NW, Washington, DC, 20037 by providing the necessary documentation to Ms. Emily Blakemore, who expressly informed the process server that she was authorized to accept service on behalf of Defendant Obama. Under FRCP 4(e)(2)(C), service on an individual may be effected by "delivering a copy of each to an agent authorized by appointment or by law to receive service of process." That is precisely how Defendant Obama was served here.

In the unlikely event that this Court finds that Defendant Obama still was not properly served, despite the strict adherence to FRCP 4(e)(2)(C), Plaintiffs respectfully request that this

Court specifically provide a means for the service of Defendant Obama. Defendant Obama cannot simply be allowed to "run from process servers" and avoid service by simple virtue of the fact that he has Secret Service agents around him at every moment that can and will help him evade service of process. Importantly, here, service of process was accepted after the process server, Same Day Process, arranged for service to be accepted through the Secret Service. It is shocking that the Federal Programs Branch would further the falsehood that the Individual-Capacity Defendant Obama has not been served. But regrettably this is not the first time, as they played this game in *Klayman I* and *Klayman II*. This time Plaintiffs made sure there would be no questions about proper service.

### G. Former FBI Director James Comey Is Not Entitled To Absolute Or Qualified Immunity.

The Individual-Capacity Defendants mistakenly argue that Defendant Comey has been only been sued in his personal capacity for Counts One and Two that directly relate to the *Bivens* claims. This false interpretation of the Complaint is the Individual-Capacity Defendants' modus operandi; another attempt to confuse the Court by straying far from the issues. The Complaint is clear: Defendant Comey acted "outside the scope of [his] employment, in [his] personal capacit[y] and through [his] surrogates still embedded in the Trump administration (the "Obama Deep State") to illegally and unconstitutionally spy on millions of Americans, including Plaintiffs, without probable cause or a warrant. Compl. at ¶ p. 3. Plaintiffs plead throughout the Complaint that the Individual-Capacity Defendants are being sued individually and officially, acting outside the scope of their employment. Because the Complaint also mentions that Individual-Capacity Defendant Comey is being sued individually under *Bivens* and officially under other causes of action does not limit his personal liability for Counts Five and Seven.

The immunity argument the Individual-Capacity Defendants set forth for Defendant

Comey is futile for the same reasons above and must be rejected, as this Court and the U.S. Supreme Court has done in the past.

### H.   The Issue of the Individual-Capacity Defendants' Alleged Qualified Immunity Must Ultimately Be Determined After Discovery

Trial courts are afforded broad discretion to regulate the progression of their cases, including discovery. In the event factual questions must be settled in order to resolve a claim of qualified immunity, the plaintiff is entitled to discovery. *Kartesva vc. Dep't of State*, 37 F.3d 1524, 1530 (D.C. Cir. 1995). In *Kartesva*, the plaintiff employee claimed that, as a result of a background security check and her disqualification, she was discharged from a government contract job and unable to find subsequent work. *Kartesva*, 37 F.3d at 1525. Because a factual dispute existed between the parties as to whether the defendant violated a right, the U.S. Court of Appeals for the District of Columbia Circuit held that limited discovery is appropriate in order to determine threshold issues, such as whether a right was violated and whether it was clearly established. *Id*. at 1530.

In *Mitchell v. Forsyth*, the U.S. Supreme Court outlined the contours of permissible discovery in the context of a defendant raising an alleged qualified immunity defense. There, a plaintiff filed a claim for damages against the U.S. Attorney General, John Mitchell, after he learned Mitchell had allegedly authorized a wiretap on his home. *Mitchell v. Forsyth*, 472 U.S. 511, 513-15 (1985). The Court held that discovery may be permitted to enable the Court to assess the facts pertinent to the qualified immunity defense. *Id*. at 526.

The U.S. Supreme Court re-affirmed this approach in *Anderson v. Creighton*. In Anderson, the Creighton family sued agents of the FBI after a warrantless search of their home. *Anderson*, 483 U.S. at 637. The Court held that:

. . . if the actions Anderson claims he took are different from those the

> Creighton's allege (and are actions that a reasonable officer could have believed
> lawful, then discovery may be necessary before Anderson's motion for summary
> judgment on qualified immunity grounds can be resolved. Of course, any such
> discovery should be tailored specifically to the question of Anderson's qualified
> immunity.

*Id*. at 647.

Similarly, in *Crawford v. Britton*, a "litigious and outspoken" prisoner claimed that he

was retaliated against due to lawsuits he had filed, and he brought new claims under the First

Amendment. *Crawford*, 523 U.S. at 574. In addressing qualified immunity within Courts of

Appeals, the U.S. Supreme Court emphasized that while "[d]iscovery involving public officials

is indeed one of the evils that *Harlow* aimed to address, [] neither that opinion nor subsequent

decisions create an immunity from *all discovery*." *Id*. at 593 (emphasis added). Indeed, "the

Court of Appeals' indirect effort to regulate discovery employs a blunt instrument that carries a

high cost, for its rule also imposes a heightened standard of proof at trial upon plaintiffs with

bona fide constitutional [or statutory] claims." *Id*. at 595-96.

These binding, U.S. Supreme Court rulings are glaringly in favor for allowing for

discovery in this case for two reasons: First, the *Anderson* Court ruled that even if a reasonable

official could have believed his actions were lawful, plaintiffs were still entitled to discovery. As

discussed above, no reasonable official in this history of U.S. government could believe that the

actions of the Individual-Capacity Defendants were lawful. Second, and as important, not only

should a motion to dismiss be denied, such as here, but also the *Anderson* Court even denied a

motion for summary judgment on the grounds that discovery was needed to ascertain factual

disputes. In *Anderson*, only if the defendant could establish after discovery that a reasonable

official could have believed his or her behavior was lawful was defendant entitled to summary

judgment.[7]

## IV.   **CONCLUSION**

For all these compelling reasons, the Individual-Capacity Defendants' Motion to Dismiss must be denied. It has long been established that the loss of constitutional freedoms, "for even minimal periods of time, unquestionably constitutes irreparable injury", and the ongoing illegal surveillance by the Individual-Capacity Defendants certainly qualifies as a violation of Plaintiffs' rights. *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009). This illegal and unconstitutional surveillance has been ongoing for years now and continues to occur, despite prior orders of this Court in related cases. It is once again up to this Court to stand up to the Individual-Capacity Defendants and force them to realize that they are not above the law or the U.S. Constitution and they must be held accountable for their egregious and unlawful violations of the U.S. Constitution and other applicable laws.[8]

Dated: October 10, 2017                                      Respectfully submitted,

                                                             */s/ Larry Klayman*
                                                             Larry Klayman, Esq.
                                                             KLAYMAN LAW GROUP, P.A.
                                                             D.C. Bar No. 334581
                                                             2020 Pennsylvania Ave. #800
                                                             Washington, D.C. 20006
                                                             Email: leklayman@gmail.com

                                                             *Attorney for Plaintiffs*

---

[7] Federal circuit courts even allow the question of qualified immunity to go to the jury. See *Curley v. Klem*, 499 F.3d 199, 208 (10th Cir. 2007) ("The Fifth, Sixth, Ninth, and Tenth Circuits have permitted the question [of qualified immunity] to go to juries.").

[8] Plaintiffs are not the only ones to be illegally surveilled. Recent disclosures show constitutional violations against President Trump and his advisers, such as General John F. Kelly, the White House Chief of Staff, in the days leading up to the inauguration and apparently thereafter. *See* https://www.forbes.com/sites/janetwburns/2017/10/05/report-white-house-thinks-john-kellys-personal-cell-phone-was-breached/#7095039054b8. The Individual-Capacity Defendants apparently act and believe that they are "untouchables."

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically and served through the court's ECF system to all counsel of record or parties on October 10, 2017 including:

James Comey
1350 Beverly Road McLean,
VA 22101

Barack Obama
2446 Belmont Rd.
Washington DC 20008

Michael S. Rogers
4628 English Ave
Fort George G Meade, MD 20755

Dan Coats
2041 Mayfair McLean Ct
Falls Church, VA 22043

James Clapper
5366 Ashleigh Rd
Fairfax, VA 22030

John Brennan
13351 Point Rider Ln
Herndon, VA 20171

Mike Pompeo
1350 Beverly Road
McLean, VA 22101

Federal Bureau of Investigation
935 Pennsylvania Ave, NW
Washington, DC, 20535

National Security Agency
9800 Savage Road, #6272
Ft George G. Meade, MD, 20755

Central Intelligence Agency
Office of Public Affairs
950 Pennsylvania Ave NW
Washington, DC, 20530

U.S. Attorney for the District of Columbia
555 4th Street NW
Washington, DC, 20530

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Ave NW
Washington, DC, 20530

*/s/ Larry Klayman*
Attorney